1       UNITED STATES BANKRUPTCY COURT
            NORTHERN DISTRICT OF INDIANA
2               SOUTH BEND DIVISION

3
    IN RE:                    ) CASE NUMBERS 16-30078 -
4                             ) 16-30088
    5 STAR INVESTMENT GROUP,  )
5   LLC, and associated       ) Chapter 11
    cases.                    )
6                             )    **COPY**
            Debtors.          )
7

8
                341 MEETING OF CREDITORS
9                 (AUDIO TRANSCRIPTION)

10
                DATE: November 15, 2016
11

12

13

14

15

16

17
        Transcribed by Tonya J. Kaiser, RPR, CMRS,
18              and Notary Public.

19

20

21

22           SUMMIT CITY REPORTING, INC.
            Certified Stenographic Court Reporters
23          203 West Wayne Street, Suite 406
              Fort Wayne, Indiana  46802
24          (260) 486-3954 | (800) 977-3376

25

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,  on 11/15/2016

Page 2

```
 1  APPEARANCES:
 2     Susan Jaffe Roberts, Esq., Assistant United States
          Trustee
 3
       Earl Miller, on behalf of the Debtors
 4
       Andrew Thompson, Esq., on behalf of Earl Miller
 5
       William R. Jonas, Jr., Esq., on behalf of the
 6        unsecured creditors
 7     Douglas R. Adelsperger, Esq, Chapter 11 Trustee
 8     Edward Kos, Esq., Kos & Associates, on behalf of the
          trustee
 9
       Matt Fisher, on behalf of William Adamczyk
10
       Samuel Swartz, investor
11
       Karen Andrews, investor
12
       Steve Height, investor
13
       Christopher Riley, Esq., on behalf of James Miller and
14        Joe Miller
15     Stan Baker, investor
16     George Horn, Esq., on behalf of Matthew Gingerich
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2            E X A M I N A T I O N S
 3
 4  Witness                                  Page
 5    EARL D. MILLER
 6        BY MR. JONAS..........................   9
 7        BY MR. KOS............................  29
 8        BY MR. FISHER.........................  35
 9        BY MR. SWARTZ.........................  37
10        BY MS. ANDREWS........................  38
11        BY MR. HEIGHT.........................  39
12        BY MR. RILEY..........................  39
13        BY MR. BAKER..........................  40
14        BY MR. KOS............................  51
15        BY MR. ADELSPERGER....................  78
16        BY ASSISTANT TRUSTEE ROBERTS..........  80
17        BY MR. ADELSPERGER....................  80
18        BY MR. KOS............................  82
19        BY MR. KOS............................  88
20        BY MR. HORN...........................  88
21        BY MR. ADELSPERGER....................  96
22        BY ASSISTANT TRUSTEE ROBERTS..........  97
23
24
25
```

Page 4

```
 1            P R O C E E D I N G S
 2  ASSISTANT TRUSTEE ROBERTS:  Good morning.
 3  Today is November 15, 2016.  It is
 4  10:00 a.m.  This is the continued meeting of
 5  creditors being held pursuant to Section 341
 6  of the bankruptcy code in the cases of 5
 7  Star Investment Group, LLC, Case Number
 8  16-30078; 5 Star Portland Holdings, LLC,
 9  Case Number 16-30079; 5 Star Investment
10  Group V, LLC, Case Number 16-30080; 5 Star
11  Commercial, LLC, Case Number 16-30081; 5
12  Star Investment Group VII, LLC, Case Number
13  16-30082; 5 Star Holdings, LLC, Case Number
14  16-30083; 5 Star Investment Group III, LLC,
15  Case Number 16-30084; 5 Star Indiana
16  Holdings, LLC, Case Number 16-30085; 5 Star
17  Investment Group II, LLC, Case Number
18  16-30086; 5 Star Investment Group IV, LLC,
19  Case Number 16-30087; and 5 Star Capital
20  Fund, LLC, Case Number 16-30088.
21      All of these cases are filed in the
22  Northern District of Indiana in the United
23  States Bankruptcy Court.  And by order of
24  the bankruptcy court, these Chapter 11 cases
25  have been substantively consolidated.  By
```

Page 5

```
 1  order of the bankruptcy court, Mr. Douglas
 2  Adelsperger was appointed Chapter 11 trustee
 3  of the consolidated debtors.
 4      My name is Susan Jaffe Roberts.  I am the
 5  assistant United States Trustee for the
 6  Northern District of Indiana with the
 7  Department of Justice and the office of the
 8  United States Trustee.
 9      The initial meeting of creditors was
10  conducted on February 29th, 2016.  A
11  continued meeting of creditors was held on
12  September 21st, 2016.
13      The purpose of this continued meeting of
14  creditors is to continue the examination of
15  the debtors under oath regarding their
16  financial affairs in these bankruptcy cases.
17  Again, this is not a judicial proceeding.
18  It's an administrative proceeding to conduct
19  a continued oral inquiry into the condition
20  of the 11 debtors.  We will ask questions
21  regarding the operations of the debtors,
22  both as individual limited liability
23  companies and, as appropriate, regarding the
24  operations of the debtors as a group.  The
25  debtors have filed their schedules of
```

**EXHIBIT 4**

Page 6

1 property and debts.
2     This meeting is being digitally recorded.
3 We will keep this recording for two years in
4 our South Bend office.  During that time,
5 you may come to our office and listen to the
6 recording of the meeting or you may send us
7 a blank writable CD, and we will make a copy
8 of the recording of the meeting for you.
9 You may also have a transcript of the
10 meeting made at your own expense.
11     During the meeting, you may be given the
12 opportunity to ask questions.  If you do,
13 you will be asked to identify yourself and
14 speak loudly and plainly so that the
15 recording is clear and accurate.  If we
16 cannot conclude the meeting today, for any
17 reason, I may continue the 341 and have it
18 be continued to a later date.  If that
19 happens, a notice of the date and continued
20 meeting will be sent out to all creditors
21 and parties in interest.
22     At the prior meeting of creditors, the
23 initial one, I asked questions on behalf of
24 the United States Trustee, as did the
25 Chapter 11 trustee, and a number of other

Page 7

1 creditors and parties in interest.  At
2 today's meeting, I will reserve any
3 additional questions for the United States
4 for later and will ask counsel for the
5 creditors committee, Mr. William Jonas, to
6 commence the questioning.  After that, we
7 will ask individual creditors who are in the
8 audience, who have not yet had their
9 opportunity to ask questions at one of the
10 prior meetings, to ask any questions that
11 they may have of the debtors.
12     Before we commence further, I will
13 administer the oath.
14     Mr. Miller, will you please identify
15 yourself for the record.
16 THE WITNESS:  Earl Miller.
17 ASSISTANT TRUSTEE ROBERTS:  Counsel?
18 MR. THOMPSON: Andrew Thompson.
19 ASSISTANT TRUSTEE ROBERTS:  Mr. Miller,
20 would you please raise your right hand?  Do
21 you swear or affirm under penalty of perjury
22 that the testimony you give here today will
23 be the truth, the whole truth, and nothing
24 but the truth?
25 THE WITNESS:  I do.

Page 8

1 ASSISTANT TRUSTEE ROBERTS:  All right.  Once
2 again, please state your full name for the
3 record.
4 THE WITNESS:  Earl D. Miller.
5 ASSISTANT TRUSTEE ROBERTS:  And, Mr. Miller,
6 are the address and contact information that
7 you previously provided to the office of the
8 U.S. Trustee still correct?
9 THE WITNESS:  Yes.
10 ASSISTANT TRUSTEE ROBERTS:  Okay.  And may I
11 again see your picture I.D.?
12 THE WITNESS:  Yep.
13 UNIDENTIFIED FEMALE VOICE:  Sorry for the
14 interruption, Mr. Miller.  We've got this
15 nice system, so you need to speak into the
16 microphone.  You're going to have to hold it
17 and be a rock star.
18 THE WITNESS:  Okay.
19     (Inaudible)
20 ASSISTANT TRUSTEE ROBERTS:  Okay.  Thank
21 you.  Now, I'm going to ask creditors
22 committee counsel, Mr. Jonas, to commence
23 asking his questions.  When he is done, I
24 will call on others of you to ask questions,
25 and we will break for lunch at about 12:45

Page 9

1     p.m. and resume the meeting as needed an
2     hour later.  Mr. Jonas, please commence.
3     EXAMINATION OF EARL D. MILLER
4 BY MR. JONAS:
5 Q.  Good morning, Mr. Miller.  My name is Will Jonas.
6     I'm the counsel for the official committee of the
7     unsecured creditors in this case.  I'd like to
8     direct your attention to the spring of 2015 and
9     ask if during that time period you recall a
10    meeting with officials of the securities
11    department of the State of Indiana.
12 A.  Yes.
13 Q.  What was, what was the -- what was -- to your
14    understanding the reason that you went to meet
15    with securities officials of the State of
16    Indiana?
17 A.  Okay.  So I'm going to be taking the Fifth
18    Amendment today on questions.
19 Q.  Well --
20    ASSISTANT TRUSTEE ROBERTS:  If I might
21    interrupt, in order to take the Fifth
22    Amendment, please be aware that you may only
23    take the Fifth Amendment on an individual
24    question basis.  You can't take it blanket.
25    So that's one.  So you will need to, if you

Page 10

1    intend to assert your privilege, you will
2    need to assert it to each question that
3    you're asked.
4        As a further reminder, to the extent that
5    questions have already been raised about
6    particular information that you have
7    answered extensively in two prior meetings,
8    you will have waived the right to assert
9    that privilege again.  Mr. Jonas.
10   MR. THOMPSON:  I'm going to state for the
11   record that, that the witness is always
12   allowed to reassert their Fifth Amendment
13   right.  At any point in time, they can
14   revoke any waiver that they've made.  I
15   understand that the evidence collected can
16   be used as if it was -- as a waiver at the
17   time that he answered the question.  But he
18   is always allowed to reinstate his -- to
19   reassert his Fifth Amendment privilege.
20   ASSISTANT TRUSTEE ROBERTS:  All right.
21   Well, we'll beg to differ, and we will go
22   ahead and proceed question by question.
23   MR. THOMPSON:  That's fine.
24   ASSISTANT TRUSTEE ROBERTS:  Mr. Jonas.
25   Q.  (By Mr. Jonas) Thank you.  Mr. Miller, you

Page 11

1    indicated that there was a meeting with Indiana
2    state securities officials sometime in the spring
3    of 2015; is that correct?
4    A.  Plead the Fifth.
5        (A discussion was held off the record.)
6    ASSISTANT TRUSTEE ROBERTS:  I think if you
7    can just raise --
8    UNIDENTIFIED VOICE:  The group may be small
9    enough today that we can --
10   ASSISTANT TRUSTEE ROBERTS:  I think we're
11   okay today.
12   UNIDENTIFIED VOICE:  -- that we can get
13   along without that.
14   Q.  (By Mr. Jonas) Mr. Miller, where did that meeting
15   take place?
16   A.  Plead the Fifth.
17   Q.  Mr. Miller, do you recall the names of any of the
18   persons who were present at that meeting?
19   A.  Plead the Fifth.
20   Q.  Were you present at that meeting on behalf of the
21   5 Star entities?
22   A.  Plead the Fifth.
23   Q.  Were there any other persons present at that
24   meeting on behalf of the 5 Star entities?
25   A.  I plead the Fifth.

Page 12

1    Q.  Were there any other persons at that meeting that
2    you know their identity?
3    A.  I plead the Fifth.
4    Q.  After that meeting, did you return to South Bend
5    or Mishawaka to the offices of 5 Star and
6    continue to operate the business of 5 Star?
7    A.  I plead the Fifth.
8    Q.  Did 5 Star make any changes after that meeting in
9    the way that it accepted money from investors?
10   A.  I plead the Fifth.
11   Q.  Did 5 Star accept money from investors by wire
12   transfers?
13   A.  Plead the Fifth.
14   Q.  Did 5 Star accept money from investors in cash?
15   A.  I plead the Fifth.
16   Q.  Did 5 Star accept money from investors by
17   personal check?
18   A.  I plead the Fifth.
19   Q.  I want to move now to the period of July, 2015 --
20   of 2015.  And when we were here in September, you
21   indicated that that was the point at which you
22   brought Global in as the turnaround agent for the
23   company.  Do you recall that testimony, sir?
24   A.  I plead the Fifth.
25   Q.  Okay.  Do you recall any of the investors to whom

Page 13

1    those funds were returned?
2    A.  I plead the Fifth.
3    Q.  Do you recall what employee of 5 Star was
4    primarily responsible for raising those funds?
5    A.  I plead the Fifth.
6    Q.  Were the funds returned to investors returned
7    from the 5 Star account?
8    A.  I plead the Fifth.
9    Q.  Who made the determination which investors would
10   have money returned to them?
11   A.  I plead the Fifth.
12   ASSISTANT TRUSTEE ROBERTS:  Can you speak
13   up?
14   THE WITNESS:  Yeah.  I'm saying the same
15   thing, so...
16   ASSISTANT TRUSTEE ROBERTS:  You need to say
17   it --
18   THE WITNESS:  Louder.
19   ASSISTANT TRUSTEE ROBERTS:  -- every time
20   loudly and --
21   THE WITNESS:  Okay.
22   ASSISTANT TRUSTEE ROBERTS:  -- and clearly
23   for the record.
24   THE WITNESS:  All right.
25   Q.  (By Mr. Jonas) What records were made of the

**EXHIBIT 4**

Page 14

```
 1        return of funds to investors in July of 2015?
 2   A.   I plead the Fifth.
 3   Q.   Were those made by 5 Star entities or by Global?
 4   A.   I plead the Fifth.
 5   Q.   Were those made at your direction or the
 6        direction of someone else?
 7   A.   I plead the Fifth.
 8   Q.   Is it your intention to plead the Fifth to every
 9        question that is asked today regardless of the
10        question?
11            ASSISTANT TRUSTEE ROBERTS:  Counsel, you may
12            not advise.
13            MR. JONAS:  I'd like the witness to answer
14            the question without conferring with counsel
15            first.
16   A.   That is my intention.
17   Q.   (By Mr. Jonas) What date is it, sir?
18   A.   The 14th.
19   Q.   In September you testified that you had a
20        75 percent interest in a company called Artisan
21        Builders.  Do you recall that testimony?
22   A.   I plead the Fifth.
23   Q.   Does Artisan Builders have any contracts -- did
24        it ever have any contracts with any of the 5 Star
25        entities?
```

Page 15

```
 1   A.   I plead the Fifth.
 2   Q.   Would you please hand me the piece of paper that
 3        you just looked at?
 4            MR. THOMPSON:  This is work product.  Yeah.
 5            MR. JONAS:  It's a document that he looked
 6            at.  I can ask for it.
 7            MR. THOMPSON:  Well, then subpoena it.
 8   Q.   (By Mr. Jonas) I'd like to ask for the production
 9        of all of the, of the documents that you have
10        read and that you've written down today.
11            MR. THOMPSON:  If you'd submit that to me in
12            writing so we can make appropriate
13            objections, then we'll do that.
14            MR. JONAS:  Counsel, is it your intention to
15            instruct your client to not respond to any
16            question regardless of whether he has
17            previously testified to those subjects?
18            MR. THOMPSON:  Okay.  You asked me about my
19            intention.  I haven't been presented with
20            that opportunity or option at this moment.
21            What I am advising my client to do is to
22            take every appropriate step to preserve his
23            Fifth Amendment rights to the maximum extent
24            possible.  This is not the first nor the
25            second time that he has been before the
```

Page 16

```
 1        committee.  But this is now the third time.
 2        Okay?  He has not been charged with
 3        anything.
 4            These questions go to personal liability.
 5        They also go to the prospect of some type of
 6        charges for criminal liability.  There has
 7        been zero, absolutely zero evidence produced
 8        to show any reason to go forward with the
 9        criminal case against my client.  It's
10        probably pretty well evident to most people
11        on the committee that whatever civil
12        liability is imposed against him is going to
13        be difficult or impossible ever to recover
14        because of his incredible lack of resources
15        because he didn't take anything from the
16        company or from the investors.
17            My client came to me with this situation
18        more than any other reason, more than any
19        other client I've ever had, with the desire
20        to help the investors recover their money.
21        He's already been before this committee
22        twice.  If the committee wants to go
23        forward, he will happily cooperate once an
24        appropriate grant of immunity has been given
25        to him.
```

Page 17

```
 1   ASSISTANT TRUSTEE ROBERTS:  Okay.  I need to
 2   just interrupt here.  And I'm speaking as
 3   the assistant United States Trustee.  We are
 4   here in a Section 341 meeting of creditors
 5   pursuant to Section 341 of the bankruptcy
 6   code.
 7   MR. THOMPSON:  I understand.
 8   ASSISTANT TRUSTEE ROBERTS:  Mr. Miller is
 9   here in his capacity as the sole owner and
10   prepetitioned manager of the 11 entities,
11   which he voluntarily committed to the
12   oversight of the United States Bankruptcy
13   Court.  This is not a criminal proceeding.
14   This is not a court hearing.  Pursuant to
15   Section 341 and 343 of the United States
16   bankruptcy code, a debtor in bankruptcy or
17   in a business bankruptcy, the principal of
18   the representative of the entity which is in
19   bankruptcy has an absolute duty under the
20   bankruptcy code to provide information with
21   respect to the liabilities and assets of the
22   debtors that -- and all of the information
23   that is in the schedules, petition, and the
24   statement of financial affairs of the
25   debtors.
```

**EXHIBIT 4**

Page 18

1     The information that Mr. Jonas is asking
2  Mr. Miller about, a good deal of it is
3  disclosed in these filings which are already
4  before the bankruptcy court, publicly noted,
5  and which are sworn to by him under
6  penalties of perjury.  His duty to respond
7  in this situation is not, is not sheltered.
8  He has an absolute duty under the code to
9  respond --
10 MR. THOMPSON:  I'm his --
11 ASSISTANT TRUSTEE ROBERTS:  -- to any -- and
12 I understand that you are asking Mr. Miller
13 to assert the Fifth to every single question
14 that is asked.  I'm merely instructing you
15 and I'm instructing everyone here with
16 respect to Mr. Miller's duties under the
17 bankruptcy code.
18     Mr. Jonas, if you would like to continue
19 your questions.
20 MR. THOMPSON:  If I may just briefly respond
21 to your comment about the absolute duty.
22 The absolute duty does not supersede his
23 absolute constitutional right, okay, under
24 the Fifth Amendment.  If this is a civil
25 proceeding, let's make it about a civil

Page 19

1  proceeding, and let's take the criminal
2  issues off the table.
3  MR. ADELSPERGER:  But --
4  MR. THOMPSON:  That can be done.
5  MR. ADELSPERGER:  -- not by -- may I?  Not
6  by anybody here.
7  MR. THOMPSON:  Not by anybody here, but the
8  SEC has been part of this as well, and they
9  have the power of -- they have enforcement
10 power by which they can, they can
11 potentially charge my client.
12 ASSISTANT TRUSTEE ROBERTS:  Okay.  We --
13 MR. THOMPSON:  And he wants to cooperate.
14 MR. ADELSPERGER:  That's painfully obvious
15 right now.  May I, may I -- I've got two
16 things.
17 ASSISTANT TRUSTEE ROBERTS:  Trustee.
18 MR. ADELSPERGER:  Trustee Doug Adelsperger.
19 One, I cannot read what's on those pieces of
20 paper right now.  I'd like to take a picture
21 from right here so that when we ask a judge
22 to have you turn them over, I can be
23 specific on what we want.  Will you consent
24 to me taking a photograph right now of what
25 I can see?

Page 20

1  MR. THOMPSON:  I can't do that right now.
2  There's nothing that I -- I'm probably going
3  to -- we work out the proper protections in
4  terms of attorney-client privilege.
5  MR. ADELSPERGER:  Sir, I can tell you right
6  now I am in no mood and no position --
7  MR. THOMPSON:  That's fine.
8  MR. ADELSPERGER:  -- to give your client any
9  protection.  Here's why:  He filed and
10 signed 11 bankruptcies.  Not 1, 11.  We are
11 entitled, not as a committee, but as the
12 trustee and the United States Trustee to
13 have 11 of these meetings.  And if that's
14 what he wants, if he wants to sit here and
15 talk and take the Fifth for 11 times, and
16 then go out in public and say, "But I want
17 to do what's right by the investors," to me
18 that seems a little self-serving.  All of
19 these questions have nothing to do with what
20 the SEC -- to date, has nothing to do with
21 what the SEC has brought up, any imaginary
22 criminal activity that is being
23 investigated, because I can assure you I'm
24 not investigating criminal activity.
25     I'm trying to piece together a puzzle, a

Page 21

1  very large puzzle on somewhere between 15
2  and 30 million dollars of investor money.
3  What happened to it?  Where is it?  How can
4  I go get it?  How can we bring it back in?
5  Those are the questions.
6  MR. THOMPSON:  Uh-huh.
7  MR. ADELSPERGER:  If he's going to take the
8  Fifth to those, we'll ultimately be in front
9  of some tribunal finding out to make sure --
10 can he be forced to answer those questions.
11 ASSISTANT TRUSTEE ROBERTS:  Okay.
12 MR. ADELSPERGER:  I get that.
13 MR. THOMPSON:  If you're talking about the
14 prospect of 11 creditors meetings with
15 creditors who may be here on any of those
16 different 11 times, and they may want to
17 come back every time, if you want to use
18 that kind of inefficient process, you're in
19 the process of reasking questions that you
20 say are already in the record again and
21 again --
22     (Indiscernible cross talk)
23 MR. ADELSPERGER:  With all due respect, he
24 started the snowball down the mountain, not
25 me.

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,  on 11/15/2016                                                    Pages 22..25

Page 22

1      MR. THOMPSON:  I understand.
2      ASSISTANT TRUSTEE ROBERTS:  Okay.  We're not
3      going to have back and forth here.  Okay?
4      In terms of the asking of the questions,
5      this is how bankruptcy works.
6      MR. THOMPSON:  I understand.
7      ASSISTANT TRUSTEE ROBERTS:  In the
8      bankruptcy code, the meeting of the
9      creditors is specifically for the purpose
10     for creditors or in this case an appointed
11     trustee or the United States Trustee to be
12     able to delve into the information that has
13     been filed publicly with the court regarding
14     the affairs of the debtor.  And that is the
15     way that the bankruptcy system works under
16     the United States code.
17     MR. THOMPSON:  I understand.
18     ASSISTANT TRUSTEE ROBERTS:  We are now going
19     to proceed forward and allow Mr. Jonas to
20     continue with his questions.  Mr. Jonas.
21     MR. JONAS:  Thank you.
22  Q.  (By Mr. Jonas) Mr. Miller, are any of the
23     investors in the Ashley Park, Timber Hollow,
24     Avalon Trace apartment complex investors who also
25     invested in any of the 5 Star entities?

Page 23

1   A.  I plead the Fifth.
2   Q.  Are any of the investors in the Fairfax or Colony
3      Place apartment complexes the same as investors
4      in any of the 5 Star entities that are debtors in
5      these bankruptcy cases?
6   A.  I plead the Fifth.
7   Q.  Are any of the investors of Golden Asset
8      Management, LLC, or Utah Holdings the same
9      identity as investors in any of the 5 Star
10     bankruptcies that are involved in these cases?
11  A.  I plead the Fifth.
12  Q.  Are any of the investors in Timber Hollow
13     apartments also investors in the 5 Star
14     bankruptcies pending in this case?
15  A.  I plead the Fifth.
16  Q.  Are any of the investors in Twin City of
17     Winston-Salem the same identity as investors in
18     these cases?
19  A.  I plead the Fifth.
20  Q.  Are any of the investors of Southern Equity Group
21     Trust the same as investors in these bankruptcy
22     cases?
23  A.  I plead the Fifth.
24  Q.  Are any of the investors in TC Commercial the
25     same as investors in these cases?

Page 24

1   A.  I plead the Fifth.
2   Q.  Are any of the investors in Village Apartments of
3      Charleston, LLC, the same as investors in these
4      pending cases?
5   A.  I plead the Fifth.
6   Q.  Are any of the investors in Cedar Apartments in
7      Madison, Tennessee, the same as investors in
8      these bankruptcy cases?
9   A.  I plead the Fifth.
10  Q.  Are any of the investors in the Albion complex in
11     Houston, Texas, the same as investors in the 5
12     Star cases before this tribunal?
13  A.  I plead the Fifth.
14  Q.  Who else besides you and Kim Bruggeman are owners
15     of 5 Star Management Solutions, LLC?
16  A.  I plead the Fifth.
17     MR. THOMPSON:  May I ask a point of
18     clarification?  Wasn't it asserted that he
19     was the sole owner of all of these 11
20     companies?  Didn't you just ask a question
21     that presumes that there's another owner?
22     MR. JONAS:  5 Star Management Solutions is
23     not one of the debtors in this case, sir.
24     MR. THOMPSON:  Thank you.  I appreciate
25     that.

Page 25

1   Q.  (By Mr. Jonas) Have any of the 5 Star debtors in
2      these cases conducted business with any entity in
3      which Marlin Schwartz has an interest?
4   A.  I plead the Fifth.
5   Q.  Have any of the debtors in these bankruptcy cases
6      worked with a lawyer named Mr. Sherman from
7      Michigan?
8   A.  I plead the Fifth.
9   Q.  Have any of the debtors in these cases worked
10     with a lawyer named Charlie Zercher from
11     Nappanee, Indiana?
12  A.  I plead the Fifth.
13  Q.  Have any of the 5 Star entities involved in this
14     case had any dealings with a lawyer named Kim
15     Taylor from California?
16  A.  I plead the Fifth.
17  Q.  Have any of the 5 Star debtors done any business
18     with a lawyer named Cassidy Fritz in Elkhart?
19  A.  I plead the Fifth.
20  Q.  Have any of the entities that are involved in
21     this case done any business with a lawyer named
22     Norman Praet?
23  A.  I plead the Fifth.
24  Q.  What other lawyers have the debtors done business
25     besides the list I just gave you?

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,  on 11/15/2016                                    Pages 26..29

Page 26

1  A.   I plead the Fifth.
2  Q.   Have any of the 5 Star entities done any business
3       with Andrew Thompson?
4  A.   I plead the Fifth.
5  Q.   Is Mr. Thompson the lawyer for 5 Star, or is he
6       the lawyer for you?
7  A.   I plead the Fifth.
8            MR. THOMPSON:  I want to make a note for the
9       record of the notes that were just shared
10      between the two attorneys so that when I ask
11      for counter-production, that we'll be --
12      you'll be aware of what I was referring to.
13           MR. ADELSPERGER:  You want to take a picture
14      of it?
15           MR. THOMPSON:  Sure.
16           MR. ADELSPERGER:  You can have it.  There
17      you go.
18           MR. JONAS:  Mr. Kos's note to me had a name
19      Andrew Thompson on it.
20           MR. THOMPSON:  I understand.  Thank you.
21           MR. JONAS:  You're welcome.  There are
22      partners of this case who are willing to be
23      transparent.
24           MR. THOMPSON:  And my client is one of them.
25           MR. JONAS:  That's a rather ironic

Page 27

1       statement, sir.
2            MR. THOMPSON:  Given that I asked for that
3       transparency in conversations that I had
4       leading up to this meeting, we could have
5       gotten a lot further if we had it.
6            ASSISTANT TRUSTEE ROBERTS:  I do want to ask
7       one question, if I may.  Mr. Thompson, you
8       are here, and for the record would you, not
9       your client, would you please clarify whom
10      you represent?
11           MR. THOMPSON:  Solely Mr. Miller.  I do not
12      represent the 5 Star companies in any way.
13           ASSISTANT TRUSTEE ROBERTS:  Thank you.
14      Mr. Jonas, please proceed.
15           MR. THOMPSON:  To further clarify, I didn't
16      advise the filing of this bankruptcy or the
17      seeking of the protection.  I was brought
18      into this case after it initiated for a
19      different purpose because of the
20      inefficiency of the proceedings, so and my
21      client's problems with retaining (inaudible)
22      counsel.
23           ASSISTANT TRUSTEE ROBERTS:  Thank you.
24      Mr. Jonas.
25  Q.   (By Mr. Jonas) Thank you.  Mr. Miller, your

Page 28

1       invocation of the Fifth Amendment right today,
2       was that -- has that been on behalf of the
3       companies?
4  A.   I plead the Fifth.
5  Q.   And is that on behalf of yourself individually?
6  A.   I plead the Fifth.
7            MR. JONAS:  That's all the questions I have,
8       Mr. Trustee.
9            MR. ADELSPERGER:  Before we move on, I have
10      one simple question.
11           ASSISTANT TRUSTEE ROBERTS:  Please.
12           MR. ADELSPERGER:  And, Mr. Miller, I'll
13      address it to you.  I do know what your
14      answer's going to be, but, Counsel, if you
15      know, given the fact that you stated the
16      inefficiencies going on here --
17           MR. THOMPSON:  Uh-huh.
18           MR. ADELSPERGER:  -- my question is quite
19      simply, Mr. Miller, or your counsel, if you
20      know, is there any other individual who can
21      appear at a meeting of creditors such as
22      this and answer questions regarding the
23      assets, operations, and finances of the
24      debtors?
25           MR. THOMPSON:  May I confer with my client?

Page 29

1            MR. ADELSPERGER:  Yes, you may.
2            MR. THOMPSON:  Thank you.
3            THE WITNESS:  I'm not sure to be honest with
4       you.
5            MR. ADELSPERGER:  Thank you.
6            THE WITNESS:  Yeah.
7            MR. KOS:  May I?
8            MR. ADELSPERGER:  Yes.
9               EXAMINATION OF EARL D. MILLER
10  BY MR. KOS:
11  Q.   Mr. Miller, I'm going to make certain assumptions
12      before I start asking you questions.  I'm going
13      to first assume that you've been fully advised by
14      your counsel what the consequences of taking the
15      Fifth Amendment are.
16           ASSISTANT TRUSTEE ROBERTS:  Just a moment.
17      Can you identify yourself for the record?
18           MR. KOS:  Ed Kos.  Excuse me.  Ed Kos.  I'm
19      an attorney for Trustee Adelsperger.
20           ASSISTANT TRUSTEE ROBERTS:  Thank you.
21  Q.   I'm going to assume that you've been fully
22      advised of the consequences of taking the Fifth
23      Amendment.
24           MR. THOMPSON:  May I?
25  Q.   And further --

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,   on 11/15/2016

Pages 30..33

Page 30

```
1          MR. KOS:  I haven't asked the question yet.
2       I'm making certain assumptions on the record
3       so that he understands them, and the
4       question will be --
5  Q.   (By Mr. Kos) But you understand that the
6       testimony that you do not give, and when you
7       exercise that right to the Fifth Amendment, can
8       be used as an inference in a civil action against
9       you that can be then used with some corroborating
10      evidence to, in fact, resolve issues of fact in
11      the matters that might be brought against you.
12          I'm also going to assume that you understand
13      that the questions that I ask are going to lock
14      your testimony in forever.  You're going to be
15      making this waiver or this exercise of the Fifth
16      Amendment, and that you can waive it at a later
17      date, but it may not be to your benefit to do so.
18          And with that said, sir, my question to you:
19      You intended to, in fact, defraud the investors
20      of the 5 Star entities?  Did you intend to
21      defraud the investors of the 5 Star entities?
22          MR. THOMPSON:  Let me interject a couple of
23      comments.
24          MR. KOS:  You're not asked the question,
25      Mr. Thompson.  I asked --
```

Page 31

```
1  MR. THOMPSON:  You're making commentary that
2  is leading to my client, as were
3  questions -- my client is not an attorney.
4  He doesn't understand the scope of the Fifth
5  Amendment as it applies to him personally
6  versus a corporate entity.  I don't
7  represent the corporations.  To my
8  knowledge, he hasn't had anyone advising him
9  of the corporations' Fifth Amendment rights
10 or lack thereof.  Number one.
11     With respect to inferences, you know, by
12 all means in a civil case, that's why we
13 have this problem right now.  He clearly has
14 no assets to pay anything anyway, so let's
15 move forward with what's real.
16 ASSISTANT TRUSTEE ROBERTS:  Mr. Thompson,
17 we're in a bankruptcy proceeding and whether
18 Mr. Earl Miller has individual assets or not
19 is not relevant necessarily to the --
20 MR. THOMPSON:  He's been asked about them on
21 the record.
22 ASSISTANT TRUSTEE ROBERTS:  Right.  It's the
23 right of the United States Trustee, the
24 trustee, and creditors under Section 341 of
25 the bankruptcy code to ask questions about
```

Page 32

```
1       the affairs, the financial affairs, the
2       condition of the debtors, the information in
3       the schedules in a voluntarily filed
4       bankruptcy case, 11 cases, which are pending
5       before the United States bankruptcy code --
6       of the northern bankruptcy court of the
7       United States District Court -- of the
8       Northern District of Indiana.  And, you
9       are not allowed to answer on behalf of your
10      client.
11          MR. THOMPSON:  I'm not attempting to.
12          ASSISTANT TRUSTEE ROBERTS:  Mr. Kos is
13      permitted, as counsel for the trustee, to
14      ask questions.  He asked a question of
15      Mr. Miller.  I'm going to ask him to repeat
16      that question.  It is a question that
17      pertains to the affairs, the operations of
18      the debtors prepetition.
19          Mr. Kos, please repeat your question.
20  Q.   (By Mr. Kos) Yeah.  Mr. Miller, as an officer of
21      5 Star -- of the various 5 Star entities, was
22      your intention to defraud the investors that lent
23      money to the 5 Star entities?
24  A.   I plead the Fifth.
25  Q.   Mr. Miller, was it your intention to misuse the
```

Page 33

```
1  funds lent to the -- I should rephrase that.
2      Mr. Miller, was it your intention to misuse
3  the funds that were entrusted to you by the
4  investors of 5 Star entities?
5      MR. THOMPSON:  May my client confer with me
6  briefly?
7      MR. KOS:  No.
8      MR. THOMPSON:  You're telling my client that
9  he can't confer with counsel?
10     MR. KOS:  My question has been asked.
11     MR. ADELSPERGER:  The question's been asked.
12     MR. THOMPSON:  Well, I was going to ask that
13 before the trustee instructed him to reask
14 the question, the preceding question that
15 was asked.  And she told him to ask the
16 question, so we've not had an opportunity --
17 ASSISTANT TRUSTEE ROBERTS:  If you would
18 like to take a five-minute break to confer
19 with your client, you may take a five-minute
20 break, confer with your client, then come
21 back, and Mr. Kos will proceed with his
22 questions.
23     MR. THOMPSON:  Okay.  Thank you.
24     (Break in audio recording)
25 ASSISTANT TRUSTEE ROBERTS:  We're back on
```

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,  on 11/15/2016

1 the record.  This is the 341 meeting for the
2 5 Star Chapter 11 cases.
3      Mr. Miller, you did indeed swear to the
4 oath earlier.  Just to remind you, your oath
5 is continuing.  You are under penalties of
6 perjury, and I'm now going to take questions
7 from individual creditors.
8      Please raise your hand if you would like
9 to ask a question and you have not
10 previously asked a question at the initial
11 341 meeting.  That's any individual
12 creditor.  Sir.
13 UNIDENTIFIED VOICE:  I'm representing an
14 individual creditor.  May I ask questions on
15 his behalf?
16 ASSISTANT TRUSTEE ROBERTS:  Yes, you may.
17 MR. ADELSPERGER:  Identify.
18 ASSISTANT TRUSTEE ROBERTS:  If you would, if
19 you would come up, you can state your name
20 for the record and identify the name of your
21 client and what his claim is against
22 whichever debtor it is.  Say whichever
23 debtor it is that he has a claim against,
24 and then proceed with your questions.
25 MR. FISHER:  My name is Matt Fisher.  I'm

1      representing Mr. William Adamczyk, his
2      claims against a number of the 5 Star
3      entities that are included in the
4      bankruptcy.  We have a couple of questions
5      if that's all right.
6           EXAMINATION OF EARL D. MILLER
7 BY MR. FISHER:
8 Q.   First, Mr. Miller, what is your current domicile
9      address, where you currently reside?
10 A.   New address is P.O. Box 573, and it's in Woodland
11      Park, Colorado.
12 Q.   Okay.
13 A.   The ZIP code is 80866.
14 Q.   Okay.  And where do you currently reside?  Where
15      do you fall asleep?
16 A.   My home address?  Okay.  Yeah.  697 Northwestern
17      Place.  You want to write it down or --
18 Q.   I can trust the transcript.
19 A.   Okay.  Northwestern Place, and it's Woodland
20      Park, 80863.
21 Q.   Okay.
22 A.   Yeah.
23 Q.   And do you own that home?  Do you -- or is it a
24      home?  Is it an apartment?
25 A.   Yeah, it's a home.

1 Q.   It's a home.  Do you own that home?
2 A.   No.
3 Q.   Do you rent that home?
4 A.   I'm going to be pleading the Fifth.
5 Q.   Okay.
6           ASSISTANT TRUSTEE ROBERTS:  Can you all
7           speak up, please?
8           THE WITNESS:  Sorry.
9           ASSISTANT TRUSTEE ROBERTS:  For the record.
10           Thank you.
11 Q.   (By Mr. Fisher) All right.  Second, are there any
12      investor funds that were directed toward 5 Star
13      entities that are not included in today's
14      bankruptcy proceeding?
15 A.   I plead the Fifth.
16 Q.   Okay.  Do you currently have an active source of
17      income that allows you to afford living in the
18      domicile that you previously listed?
19 A.   I plead the Fifth.
20 Q.   Where -- do you have personal bank accounts, and
21      where are those personal bank accounts located in
22      terms of their state or the bank?
23           MR. THOMPSON:  Is this within the scope of
24           the examination for the 5 Star companies?
25           MR. FISHER:  Our argument is that there's a

1      possible intermixing of assets between
2      corporate and personal.
3           ASSISTANT TRUSTEE ROBERTS:  Okay.  Then I
4           would say, yes, it is.  Proceed.
5 A.   I plead the Fifth.
6           MR. FISHER:  Okay.  That's all.  Thank you.
7           ASSISTANT TRUSTEE ROBERTS:  Thank you.
8           Anyone else who would like to ask questions?
9           Come up.  Please state your name for the
10           record.
11           MR. SWARTZ:  Samuel Swartz.
12           EXAMINATION OF EARL D. MILLER
13 BY MR. SWARTZ:
14 Q.   In May of 2015 or June of 2015, May or June --
15           MR. THOMPSON:  Please state your claim as a
16           creditor.  Which company do you have a claim
17           against?
18           MR. SWARTZ:  Well, I'm committee.
19           UNIDENTIFIED MALE VOICE:  He's a member of
20           the committee.
21           MR. THOMPSON:  Okay.  That's fine.
22           (Indiscernible cross talk)
23 Q.   (By Mr. Swartz) In June of 2015, I put 125,000
24      into a promissory note in Commercial.  Then on
25      July of '15, you already locked everything up.

**EXHIBIT 4**

Page 38

```
 1        What did you do with all that money when you
 2        closed up the entity that you hadn't put it into?
 3   A.   I plead the Fifth.
 4   Q.   Okay.  We'll get an answer someday.
 5             ASSISTANT TRUSTEE ROBERTS:  Next person.
 6        Anyone else?  Come forward.  State your name
 7        for the record, ma'am.
 8             MS. ANDREWS:  I'm Karen Andrews.  I'm an
 9        investor as well as on the unsecured
10        creditors committee.
11             EXAMINATION OF EARL D. MILLER
12   BY MS. ANDREWS:
13   Q.   I would like to ask, Earl, at what point in time
14        did you, representing 5 Star, knowingly begin to
15        put more investment money into a mortgage than
16        the property was worth?
17   A.   I plead the Fifth.
18   Q.   And do you wish to use your personal investments
19        and personal finances to pay back people who have
20        invested and have lost money?
21   A.   I plead the Fifth.
22             ASSISTANT TRUSTEE ROBERTS:  Anyone else?
23        Please, sir.
24             MR. HEIGHT:  My name's Steve Height.
25
```

Page 39

```
 1             EXAMINATION OF EARL D. MILLER
 2   BY MR. HEIGHT:
 3   Q.   I have invested in 5 Star Portland, whatever that
 4        involves.  I don't think we've ever met.  We've
 5        spoken on the phone, and I think it was September
 6        of 2015.  Many of the questions I have, have
 7        already been asked, and you're pleading the
 8        Fifth, and I appreciate that.  But you made a
 9        statement to me at that time that you were going
10        to do everything in your power to get my money
11        back.
12             May I ask you, what are you doing to get my
13        money back?
14   A.   I plead the Fifth.
15   Q.   Thank you.
16             MR. RILEY:  My name is Christopher Riley.
17        I'm an attorney for creditors James Miller
18        and Joe Miller.  And they have filed proofs
19        of claim against 5 Star Investment Group II,
20        LLC.
21             EXAMINATION OF EARL D. MILLER
22   BY MR. RILEY:
23   Q.   Mr. Miller, were you ever an officer of 5 Star
24        Investment Group II, LLC?
25   A.   I plead the Fifth.
```

Page 40

```
 1   Q.   My clients obtained real estate mortgages for
 2        money loaned on properties purchased in St.
 3        Joseph County in South Bend.  Did 5 Star
 4        Investment Group II, LLC, ever obtained more
 5        mortgages on those properties in South Bend than
 6        the properties were worth?
 7   A.   I plead the Fifth.
 8             ASSISTANT TRUSTEE ROBERTS:  Anyone else?
 9             MR. BAKER:  I'm Stan Baker.
10             EXAMINATION OF EARL D. MILLER
11   BY MR. BAKER:
12   Q.   I just had a question here.  I've been invested
13        since 2012 in several different entities, and I'm
14        not sure where my money is at the present.  I was
15        in Oregon.  I did, the end of May, switch to TC
16        Commercial.  At that time I did receive a
17        promissory note stating the 304 (inaudible)
18        Middlebury, and then I got a private placement
19        memorandum from TC Commercial, which is a North
20        Carolina limited liability company.
21             Can you tell me the address for that North
22        Carolina limited liability company?
23   A.   I'm going to answer this one.  The TC Commercial
24        is the one that owned Twin City.  There's -- I
25        want to answer all the questions, but because of
```

Page 41

```
 1        the nature of today, I'm pleading the Fifth.  So
 2        just so you know, I want to answer questions; but
 3        I'm pleading the Fifth today because of the
 4        nature of where we're at.
 5             But to answer your question there, had we
 6        been allowed to execute -- your money went to
 7        Twin City.  Had we been allowed to execute, you
 8        would today have ownership in that property.
 9        It's a great property.  We had a bunch of money
10        in escrow for rehab, but we were not allowed to
11        execute.  And so it's been -- unfortunately the
12        trustee has lost it.  So I apologize.
13   Q.   So TC Commercial --
14   A.   Yes.
15   Q.   -- is an entity of Twin City?
16   A.   Yeah.  Yes.  It has ownership in Twin City.  We
17        brought the notes.  We recognized we should have
18        it in subscription agreements and operating
19        agreements.  We had everything drawn up, ready to
20        switch over, and then we were not allowed to
21        execute unfortunately.  So when -- I really,
22        really care about you investors.  I really do.
23        Unfortunately, my hands are tied, so...
24   Q.   There -- I've got another question that I'd like
25        to state.  Mike Alfrey was who I was dealing with
```

Page 42

1    on this; and when I went from Portland to this TC
2    Commercial, TC Commercial I understand is not
3    in -- the way I look at it in a bankruptcy that I
4    see an entity behind, I own some property in --
5    out west, and I stated that I was going to
6    roll -- possibly sell that property.  And Mike
7    Alfrey did state at that time that he might
8    personally be interested in buying that property.
9    And at that time he told me that you might be
10   interested in putting up -- you were looking into
11   putting up a hurricane-resistant,
12   tornado-resistant, and I think he said
13   earthquake-resistant home as a show place or
14   model home or whatever.
15        I don't -- I never talked to you personally,
16   but that was brought up in our conversation.  So
17   I'm just, you know, I'm just trying to dig up a
18   little bit.  Where is our money?  Where is --
19 A.  I have to plead the Fifth.
20 Q.  All right.  Thank you.
21        MR. ADELSPERGER:  If I may, this may be an
22        appropriate time just so that the record is
23        straight for me to comment.  You may be
24        seated because I'm going to take a moment
25        here.

Page 43

1       With regard to TC and Twin Cities, and
2    this is the second time on the record that
3    my efforts have been questioned with regard
4    to this bankruptcy.  And it's the third time
5    that I am aware of that my efforts have been
6    questioned with regard to this bankruptcy
7    with regard to TC.
8       Specifically, some of you in this
9    audience, and maybe all of you, I don't
10   really care to know, but maybe you have
11   received an e-mail on October 24, 2016, from
12   a gentleman by the name of Bob Sutter that
13   said a number of things.  And I'm going to
14   take this opportunity to read through a
15   prepared statement that I have, and it was
16   prepared on the possibility that we would
17   stumble back into this particular issue.
18      Some of you who are here today may have
19   received an e-mail correspondence from Bob
20   Sutter regarding Twin City Townhomes.  I
21   would like to clear up some of the
22   misinformation that was provided in that
23   e-mail and also give you an update with
24   regard to Twin City Townhomes.
25      When the bankruptcy cases, 11 in all,

Page 44

1    were originally filed, the debtors were not
2    completely forthcoming regarding the
3    information about Twin City.  On the 5 Star
4    Commercial bankruptcy schedules, the debtors
5    did not list that 5 Star Commercial, LLC,
6    had an ownership in the Twin City Townhomes.
7    Because the schedules list a fairly large
8    receivable due from Twin City Townhomes and
9    because the proofs of claim that were filed
10   in the end of April and beginning of May
11   suggested that 5 Star Commercial may, in
12   fact, have an ownership interest in the Twin
13   City Apartments, my legal team and I began
14   investigating the matter.
15      Upon interviews conducted by myself and
16   my counsel, we learned that Mr. Miller
17   either individually, through one or more of
18   the debtors or a trust or on a nonfiling 5
19   Star entity, purchased an apartment complex
20   in Winston-Salem, North Carolina, known as
21   Twin City Townhomes sometime in the summer
22   of 2015.  We were not given any information
23   or documentation reflecting whether or not
24   the complex was owned outright by
25   Mr. Miller, by an entity owned by

Page 45

1    Mr. Miller, or by one of the 5 Star entities
2    in bankruptcy or not in bankruptcy.
3       We, my team and I, ordered title work and
4    learned that the complex had been purchased
5    in July of 2015 for $7.5 million, right
6    around the same time that the SEC began its
7    investigation of Mr. Miller and 5 Star.
8    Although the title work showed that the
9    owner was an Indiana LLC and that there was
10   a mortgage on the property for about
11   $7.1 million, the title work did not show
12   who owns the LLCs, whether the investor
13   money was used to purchase Twin Cities, or
14   whether any of the money of the debtor
15   entities was used to purchase Twin Cities.
16   Accordingly, I instructed my legal counsel
17   to serve several subpoenas to obtain
18   information of the owners of Twin City and
19   details of the purchase of Twin City.
20      Counsel served those subpoenas on 5 Star
21   Management Solution, LLC, care of Norman D.
22   Praet, an attorney in North Carolina, and TC
23   Commercial, LLC, in care of Norman Praet.
24   Mr. Praet did not immediately respond to
25   those subpoenas.

EXHIBIT 4

5 Star Investment Group
341 Meeting,  on 11/15/2016                                                                 Pages 46..49

Page 46

1    On June 13th of 2016, Mr. Miller filed a
2    statement of confession in the SEC matter
3    stating that he was willing to cooperate,
4    but he failed to provide the requested
5    documents or provide any explanation
6    whatsoever of the structure of the ownership
7    of Twin City and the detail of sale.  We, my
8    team and I, continued to pursue avenues to
9    obtain information regarding the fund that
10   has been utilized to purchase Twin Cities.
11       My counsel contacted Kim Taylor, legal
12   counsel for the other apartment complexes
13   associated with this case; Kim Bruggeman,
14   the person supposedly managing the Twin City
15   Townhomes; and Mr. Praet.  In addition, my
16   counsel spoke to an individual who asked to
17   be named -- to be kept confidential and
18   learned that the complex was in bad repair,
19   the target of numerous zoning and hazardous
20   health violations, and subject to several
21   lawsuits.
22       In early August, we learned that the
23   mortgage was in default and that U.S. Bank
24   had commenced a lawsuit and was asking for
25   the appointment of a receiver.  My counsel

Page 47

1    contacted Mrs. Bruggeman about this lawsuit.
2    Mrs. Bruggeman represented that a Mr. Carl
3    Withers; a Mr. Babenco; and a Mr. Kuatt,
4    K-U-A-T-T, if I'm not pronouncing that
5    correct; and herself were going to make an
6    offer to purchase the apartment complex that
7    would pay off the bank and protect investor
8    money.
9        My counsel requested that Mrs. Bruggeman
10   provide my counsel with a list of the
11   investors and the financial information,
12   including rent rolls, balance sheet, income,
13   and expense statements.  In addition, my
14   counsel requested that Mrs. Bruggeman
15   provide documents reflecting the ownership
16   structure of Twin Cities, LLC.
17       To avoid the immediate appointment of a
18   receiver, I hired a lawyer in North Carolina
19   to appear in the action filed by the bank
20   and to buy some time to allow
21   Mrs. Bruggeman's group to make the offer.
22   The bank was asked for -- the bank was
23   asking for several documents from
24   Mrs. Bruggeman and agreed to stand down
25   until the documents were received.  The

Page 48

1    documents were not immediately provided.  An
2    offer was never made.  The bank was going to
3    push forward with the appointment of a
4    receiver.  Lawsuits were continued to be
5    filed, and the additional health and zoning
6    violations were pursued.
7        A receiver was appointed, and we made the
8    decision not to utilize this bankruptcy's
9    estate fund to fight an appointment of a
10   receiver.  On September 19th of 2016, we
11   finally received documents from Mr. Praet.
12   Among the documents was a trust instrument
13   created by Mr. Miller and a Mr. Marlin
14   Schwartz known as Southern Equity Group
15   Trust.  I'm sorry.  Southern Equity Group
16   Living Trust.  The governance documents of
17   the Twin City Winston-Salem, LLC, were also
18   received.  Those documents reflect that the
19   Southern Equity Group Trust owns 90 percent
20   of the Twin City Winston-Salem, LLC, and
21   that 5 Star Commercial only had a 5 percent
22   interest.
23       On September 15, 2016, we finally
24   received the investor list.  That list
25   disclosed close to $2 million in investments

Page 49

1    that were apparently earmarked for Twin
2    Cities.  We also received a closing
3    statement when Twin City Townhome was
4    purchased and learned that 1.4 million in
5    cash was contributed to purchase the
6    apartment complex in July of 2015.
7        You may have heard from certain
8    individuals involved in this case that the
9    apartment building was not successful
10   because the SEC froze the bank account.  We
11   have not been able to find any evidence that
12   there was any account or substantial cash
13   earmarked to pay any operating expenses of
14   Twin City.  What we have learned is that the
15   U.S. Bank was holding approximately $600,000
16   in a repair account.  In order to access
17   that account, Twin City had to actually make
18   repairs and ask for reimbursement from the
19   bank.  From day one, Twin City did not have
20   enough money to make repairs and receive
21   reimbursement from the bank.  It is unclear
22   why Twin Cities did not have operating
23   capital.
24       If you recall during our last meeting,
25   Ms. Caruso asked Mr. Miller if he raised

**EXHIBIT 4**

Page 50

1   $2 million for Twin Cities and $1.4 million
2   was paid at closing, then where did that
3   600,000 go?  Why did Twin Cities not have
4   any operating funds?  Because Twin Cities
5   could not perform the repairs and the
6   property became in disrepair, the vacancy
7   rate increased, rents became delinquent.
8   Twin City became in default of its
9   obligations to its vendors and U.S. Bank.
10       An independent receiver is now in place
11   managing Twin Cities.  Ms. Bruggeman,
12   Mr. Babenco, Mr. Withers, and Mr. Kuatt are
13   free to make an offer to the receiver to buy
14   that complex if they so choose.  The
15   receiver reports that the lender is
16   releasing moneys now to make rehab of the
17   apartments on an as-needed basis to fill
18   vacancies.  The receiver has rented eight
19   refurbished apartments and eight more are in
20   the works.  The receiver further reports
21   that Twin City of Winston-Salem was not
22   paying its vendors and approximately
23   $200,000 is owed to these vendors.  It is
24   also uncertain whether the bank will
25   continue to advance money for tenant

Page 51

1            improvement.  It is also uncertain whether
2            the bank will push forward with foreclosure
3            action to allow the receiver to continue to
4            manage these townhomes.
5                 That's my report with respect to this.
6            If you have specific questions with regard
7            to this issue, I would suggest that you
8            e-mail them to me so that I can get them to
9            my counsel who knows the answers or are
10           working on the answers.  Danger happens,
11           people, when you go outside of these
12           meetings to try to get your information.
13           That's my statement.
14           ASSISTANT TRUSTEE ROBERTS:  Thank you,
15           Trustee Adelsperger.  And I'm going to now
16           ask if anyone else in -- any other
17           individual creditors would like to step
18           forward to ask questions of Mr. Miller.
19           Okay.  So seeing none, I'm going to ask
20           Mr. Kos to continue with such questions as
21           he has.
22                 EXAMINATION OF EARL D. MILLER
23   BY MR. KOS:
24   Q.      Mr. Miller, we've just heard a little bit about
25           Twin Cities, so I'll start there.  With regard to

Page 52

1            Twin City, the ownership on the deed for that
2            property is Twin City of Winston-Salem, LLC, an
3            Indiana limited liability company.  Are you the
4            owner of that limited liability company?
5    A.      I plead the Fifth.
6    Q.      The Secretary of State -- would it surprise you
7            that the records of the Secretary of State show
8            that you are the 100 percent owner of the -- of
9            that LLC that owns the North Carolina property?
10   A.      I plead the Fifth.
11   Q.      Mr. Miller, Southern Equity Group Trust, from the
12           closing statement, doesn't show that it paid any
13           money at the closing.  Why does Southern Equity
14           Group Trust have a 95 percent interest in that
15           management company and the operation of the
16           property?
17   A.      I plead the Fifth.
18   Q.      Isn't it true, Mr. Miller, that the $1.9 million
19           that was raised for the purchase of Twin Cities
20           came from 5 Star investors?
21   A.      I plead the Fifth.
22   Q.      Isn't it true, Mr. Miller, that when you raised
23           the money from the 5 Star investors, you intended
24           to defraud them?
25   A.      That is not true, sir.  I wouldn't defraud

Page 53

1            investors intentionally.
2    Q.      Please explain.  I think you've just waived
3            your -- please give a full answer how you, how
4            you didn't intend to defraud the investors when
5            you set up all these multiple layers of ownership
6            and that the benefit for the property, ownership
7            of that property fell to you personally or to a
8            trust in which you and Marlin Schwartz were
9            owners?
10   A.      The investor money was raised in notes,
11           promissory notes.  It was as debt.  The same
12           thing -- the way houses were.  And our goal was
13           to switch it over and give them ownership.
14           Simple as that.  That's what our goal was, but we
15           weren't allowed to execute.
16   Q.      There was nothing in the SEC that had any action
17           against the Twin Cities -- they didn't even know
18           about it.
19   A.      It was mentioned in the first 341 conference and
20           I, and I -- what Adelsperger said was in the
21           first 341 conference I specifically mentioned I
22           will do whatever I need to do to switch over Twin
23           City and all the investors and get them
24           ownership.  And I explained what we were doing.
25           You can go back and listen to it.  But my

5 Star Investment Group
341 Meeting,   on 11/15/2016

Page 54

```
 1        intention was not to defraud investors in Twin
 2        City, and I'm being very straightforward here.
 3   Q.   So is your testimony today that, in fact, the
 4        $1.9 million that was raised for 5 Star -- from 5
 5        Star investors, in fact, gives them the ownership
 6        of Southern Equity Group Trust, gives them the
 7        ownership of the property in Winston-Salem, North
 8        Carolina, and all of the intervening levels of
 9        management?
10   A.   I plead the Fifth on that, yeah.  It's not
11        specific.
12   Q.   Mr. Miller, have you had communications with Kim
13        Bruggeman after the time that the Chapter 11
14        bankruptcies were filed?
15   A.   I plead the Fifth.
16   Q.   Is Kim Bruggeman a partner of yours?
17   A.   I plead the Fifth.
18   Q.   Are you aware of Kim Bruggeman paid herself
19        considerable fees from the management and
20        operation of Twin Cities apartments?
21   A.   I plead the Fifth.
22   Q.   Are you aware, Mr. Miller, that the Twin Cities
23        obligations to U.S. Bank were paid through June
24        of 2016?
25   A.   I plead the Fifth.
```

Page 55

```
 1   Q.   Are you aware that after June of 2016, Kim
 2        Bruggeman failed to collect rents from the
 3        tenants of this apartment complex?
 4   A.   I plead the Fifth.
 5   Q.   Do you have any communications with Kim Bruggeman
 6        concerning the lawsuit that's been filed by U.S.
 7        Bank?
 8   A.   I plead the Fifth.
 9   Q.   Have you had any communications with Carl Withers
10        concerning this property in North Carolina?
11   A.   I plead the Fifth.
12   Q.   Have you had any communications with Ed Babenco
13        concerning this property in North Carolina?
14   A.   I plead the Fifth.
15   Q.   Have you had any communications with Alan Kuatt
16        concerning this property in North Carolina?
17   A.   I plead the Fifth.
18   Q.   Mr. Praet, have you had communications with him?
19   A.   I plead the Fifth.
20   Q.   Have you had communications with Kim Taylor?
21   A.   I plead the Fifth.
22   Q.   Have you had any communications with Bob Sutter
23        concerning this property in North Carolina?
24   A.   I plead the Fifth.
25   Q.   Have you had any communications with any other
```

Page 56

```
 1        person, not your lawyer, concerning this property
 2        in North Carolina?
 3   A.   I plead the Fifth.
 4   Q.   Mr. Miller, isn't it true that you made
 5        misrepresentations to the 5 Star investors
 6        concerning their investments in this North
 7        Carolina property?
 8   A.   I plead the Fifth.
 9   Q.   Did you represent to those investors that they
10        were, in fact, getting ownership of the North
11        Carolina property?
12   A.   I plead the Fifth.
13   Q.   Isn't it true, Mr. Miller, you didn't put any of
14        your own money into the investment in the North
15        Carolina property?
16   A.   I plead the Fifth.
17   Q.   Isn't it true, Mr. Miller, you have not put any
18        of your own money into any of the investments
19        being held by 5 Star investment?
20   A.   I plead the Fifth.
21   Q.   Isn't it true, Mr. Miller, that you also received
22        compensation that's not been disclosed?
23   A.   I plead the Fifth.
24   Q.   Mr. Miller, isn't it also true that you made
25        misrepresentations to the investors that invested
```

Page 57

```
 1        in properties in Portland, Oregon?
 2   A.   I plead the Fifth.
 3   Q.   Mr. Miller, did you invest any of your personal
 4        money in the properties in Portland, Oregon?
 5   A.   I plead the Fifth.
 6   Q.   Mr. Miller, did you invest any of your money into
 7        the properties that are found here in northern
 8        Indiana?
 9   A.   I plead the Fifth.
10   Q.   Isn't it true, Mr. Miller, as early in 2015, you
11        and others in 5 Star were well aware that the
12        Indiana properties were at least a million
13        dollars under water?
14   A.   I plead the Fifth.
15   Q.   Isn't it true, Mr. Miller, in 2015 you, you gave
16        instructions to your employees in an attempt to
17        sell that portfolio of properties?
18   A.   I plead the Fifth.
19   Q.   Isn't it true, Mr. Miller, that in 2015 and
20        thereafter, when properties in northern Indiana
21        were sold, you had to bring funds to the closings
22        because the properties were underwater?
23   A.   I plead the Fifth.
24   Q.   Mr. Miller, isn't it true that you accepted funds
25        from investors in 2015 to pay investors who had
```

Page 58

1    been -- who had loaned money to 5 Star entities
2    before their investments?  I'll withdraw that.
3    I'll rephrase it for you.
4        Isn't it true, Mr. Miller, that you used
5    later investment money to pay the dividends to be
6    paid to earlier investors?
7  A. I plead the Fifth.
8  Q. Mr. Miller, isn't it true that you made
9    intercompany transfers to hide your efforts to
10   defraud the investors?
11 A. I plead the Fifth.
12 Q. Isn't it true, Mr. Miller, that you accepted
13   funds from Marlin Schwartz for ownership interest
14   in the 5 Star entities?
15 A. I plead the Fifth.
16 Q. Isn't it true, Mr. Miller, that Marlin Schwartz
17   is no longer an owner of 5 Star -- of any of the
18   5 Star entities?
19 A. I plead the Fifth.
20 Q. Isn't it true, Mr. Miller, that you passed or,
21   well, paid Mr. Schwartz money for his interest so
22   that he would not be an interest when these
23   bankruptcies were filed?
24 A. I plead the Fifth.
25 Q. Mr. Miller, is it true that you made donations on

Page 59

1    behalf of the 5 Star entities to Z Ministries for
2    which there was no consideration given by Z
3    Ministries?
4  A. I plead the Fifth.
5  Q. Is it true, Mr. Miller, that over a hundred
6    thousand dollars of investor money was
7    transferred from 5 Star entities to Z Ministries?
8  A. I plead the Fifth.
9  Q. Mr. Miller, is it true that you sold on land
10   contract a property in Indiana to Servants of the
11   Streets?
12 A. I plead the Fifth.
13 Q. Isn't it true, Mr. Miller, that you sold that
14   property for less than its true fair value?
15 A. I plead the Fifth.
16 Q. Isn't it true, Mr. Miller, that you made a
17   fraudulent transfer by reducing that purchase
18   price by giving them a $10,000 credit as a,
19   quote, charitable donation?
20 A. I don't know what you're talking about to be
21   honest with ya.
22 Q. Mr. Miller, did you sell the property to Servants
23   of the Streets for $25,000, of which 10,000 was
24   paid by a $10,000 donation by the 5 Star
25   entities, resulting in a net purchase price of

Page 60

1    $15,000?
2  A. I don't know.  I don't know what you're talking
3    about.
4  Q. You don't know anything about the transfer to
5    Servants of the Streets?
6  A. No.
7  Q. Do you know who would?
8  A. Matt would.
9  Q. Matt would?
10 A. Yeah.
11 Q. And how would Matt know?
12 A. I think he was the one that sold it to them.
13 Q. And did Mr. Zercher prepare the paperwork for
14   that transfer?
15 A. I have no idea.
16    MR. ADELSPERGER:  For the record, Matt
17    Gingerich?
18    THE WITNESS:  Yes.
19    MR. ADELSPERGER:  Thank you.
20 Q. (By Mr. Kos) Mr. Miller, have you made fraudulent
21   transfers of property or money to any other
22   person?
23 A. Not that I'm aware of, no.
24 Q. Mr. Miller, can you tell us about South Fork
25   Harvester and the property that it owns in

Page 61

1    Goshen, Indiana?
2  A. I plead the Fifth.
3  Q. It's going to take awhile.  I have a lot of
4    folders to go through.
5  A. Yeah.
6  Q. Mr. Miller, are you the owner of National Real
7    Estate Group, LLC?
8  A. I plead the Fifth.
9  Q. Mr. Miller, are you the owner of Mountain View
10   Holdings Trust?
11 A. I plead the Fifth.
12 Q. Mr. Miller, are you the owner of Multifamily
13   Holdings, LLC?
14 A. I plead the Fifth.
15 Q. Mr. Miller, are you the owner of A to Z Builders,
16   LLC?
17 A. I plead the Fifth.
18 Q. Are you the owner of Legacy Builders Trust?
19 A. I plead the Fifth.
20 Q. Artisan Builders, LLC?
21 A. I plead the Fifth.
22 Q. Mr. Miller, is it true that you created Mountain
23   View Holdings Trust to be the ultimate owner of
24   the various 5 Star entities?
25 A. I plead the Fifth.

5 Star Investment Group
341 Meeting,   on 11/15/2016                                                                  Pages 62..65

Page 62

1  Q.  Mr. Miller, is it true that you are an investor
2      in Green Resource Homes, Inc.?
3  A.  I plead the Fifth.
4  Q.  Mr. Miller, is it true that you have worked with
5      Julius Toth and Robert Foraker to defraud the
6      investors of 5 Star entities in your investments
7      in the Green Resource Homes, Inc.?
8  A.  No, that is not true.
9  Q.  Please explain.
10 A.  I haven't intentionally defrauded the investors.
11 Q.  Didn't you provide Toth and Foraker a large sum
12     of money for the purchase of real estate and for
13     the purchase of various inventory and various
14     supposedly eco-friendly products?
15 A.  I did, but it was not with the intent to defraud.
16 Q.  Oh, it just had that effect?  Did they defraud
17     you?
18 A.  Yes.
19 Q.  Are you aware that the trustee has filed a
20     lawsuit trying to recover those funds that have
21     been defrauded by Mr. Toth and Mr. Foraker?
22 A.  I was not.  I'm glad to hear that.
23 Q.  Are you willing to provide testimony to assist us
24     in the prosecution of that matter?
25 A.  Yes.

Page 63

1  Q.  Mr. Miller, is it true that 5 Star investor money
2      is -- was used to purchase Village Apartments of
3      Charleston, LLC?
4  A.  I plead the Fifth.
5  Q.  Mr. Miller, is it true that 5 Star investment
6      money has been used in Bedrock Management
7      Solutions, LLC?
8  A.  No.
9  Q.  All right.  What money did go into Bedrock
10     Management Solutions, LLC?
11 A.  None that I'm aware of.
12 Q.  What does Bedrock Management Solutions own?
13 A.  I don't think it owns anything.
14 Q.  What does it do?
15 A.  It manages Withers, Kuatt, and Babenco's
16     properties.
17 Q.  Do you have an ownership interest with those
18     gentlemen you just named personally?  Personally,
19     do you have an interest in Bedrock Management
20     Solutions?
21 A.  I did, but I signed it over to them because I
22     went my own way and they went their way.  So I
23     don't have -- that entity does not have any
24     assets.
25 Q.  And when did you sign that interest over to them?

Page 64

1  A.  I don't remember.
2  Q.  Do you have paperwork?
3  A.  No.
4  Q.  Do you have documents concerning that transfer?
5  A.  The server was taken.
6  Q.  When was the -- when did that transfer occur?
7  A.  I don't know.
8  Q.  Was it in 2015?
9  A.  I don't know.
10 Q.  Mr. Miller, did 5 Star investors' money go into
11     Colonial Place Apartments?
12 A.  I plead the Fifth.
13 Q.  Mr. Miller, did 5 Star investor money go into
14     Ashley Park Apartments?
15 A.  I plead the Fifth.
16 Q.  Mr. Miller, did 5 Star investor money go into
17     Timber Hollow Apartments?
18 A.  I plead the Fifth.
19 Q.  Mr. Miller, did 5 Star investor money go into
20     Avalon Trace Apartments?
21 A.  I plead the Fifth.
22 Q.  Mr. Miller, did 5 Star investor money go into
23     Parkfairfax Apartments?
24 A.  I plead the Fifth.
25 Q.  Mr. Miller, did 5 Star investment money go into

Page 65

1      Ace Property Group, LLC?
2  A.  I plead the Fifth.
3  Q.  Mr. Miller, did 5 Star investment go into
4      Springmont Holdings, LLC?
5  A.  I plead the Fifth.
6  Q.  Mr. Miller, did 5 Star investor money go into
7      Avalon Trace Management, LLC?
8  A.  I plead the Fifth.
9  Q.  Mr. Miller, did 5 Star investment money go into
10     Trent Holdings Group, LLC?
11 A.  I plead the Fifth.
12 Q.  Mr. Miller, did 5 Star investor money go into
13     Fairfax Holdings, LLC?
14 A.  I plead the Fifth.
15 Q.  Mr. Miller, did 5 Star investment go into Avalon
16     Trace Holdings, LLC?
17 A.  I plead the Fifth.
18 Q.  Mr. Miller, did 5 Star investor money go into
19     Utah Holdings Group, LLC?
20 A.  I plead the Fifth.
21 Q.  Mr. Miller, did 5 Star investment money go into
22     Albion Premier Investments, LLC?
23 A.  I plead the Fifth.
24 Q.  Mr. Miller, did 5 Star investment money go into
25     Albion Premier Manager, LLC?

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,  on 11/15/2016

Pages 66..69

Page 66

1  A.   I plead the Fifth.
2  Q.   Mr. Miller, what is 5 Star Investing?
3  A.   I plead the Fifth.
4  Q.   Mr. Miller, what is 5 Star Holdings, LLC?
5  A.   I plead the Fifth.
6  Q.   Mr. Miller, what is 5 Star Capital Fund, LLC?
7  A.   I plead the Fifth.
8  Q.   Mr. Miller, what is 5 Star Fund I, LLC?
9  A.   I plead the Fifth.
10 Q.   Mr. Miller, what is 5 Star Fund II, LLC?
11 A.   I plead the Fifth.
12 Q.   Mr. Miller, these last three entities that I just
13      talked about were all created in 2015.  Did 5
14      Star investment money -- was it used for
15      capitalization of those entities?
16 A.   I plead the Fifth.
17 Q.   Please explain, Mr. Miller, what was the purpose
18      of Mountain View Holdings?
19 A.   I plead the Fifth.
20 Q.   Mr. Miller, what is Blue Eagle Ventures, LLC?
21 A.   I plead the Fifth.
22 Q.   Mr. Miller, did any 5 Star investor money go into
23      Blue Eagle Ventures, LLC?
24 A.   I plead the Fifth.
25 Q.   Is that a Florida LLC, Mr. Miller?

Page 67

1  A.   I plead the Fifth.
2  Q.   Do you have any property in Bradenton, Florida?
3  A.   I plead the Fifth.
4  Q.   Does any of the 5 Star entities have property in
5       Florida?
6  A.   I plead the Fifth.
7  Q.   Does any of the 5 Star entities have property in
8       Texas?
9  A.   I plead the Fifth.
10 Q.   Does it have property -- does any of the 5 Star
11      entities have properties in North Carolina?
12 A.   I plead the Fifth.
13 Q.   Does any of the 5 Star entities have properties
14      in South Carolina?
15 A.   I plead the Fifth.
16 Q.   Does it have any property in any other state?
17 A.   I plead the Fifth.
18 Q.   Mr. Miller, does any 5 Star money -- any money
19      from 5 Star investors -- was it transferred to GD
20      as 5 Star Villa?
21 A.   I plead the Fifth.
22 Q.   Mr. Miller, has any 5 Star investor money been
23      transferred to FireStar Group, LLC?
24 A.   I plead the Fifth.
25 Q.   Mr. Miller, are any of the 5 Star investor funds

Page 68

1       transferred to GBS Fairway Management?
2  A.   I plead the Fifth.
3  Q.   Mr. Miller, has any 5 Star investor money been
4       transferred to Golden Asset Management?
5  A.   I plead the Fifth.
6  Q.   Mr. Miller, has any 5 Star investor money been
7       transferred to Sungate Apartments?
8  A.   I plead the Fifth.
9  Q.   Mr. Miller, has any 5 Star investor money been
10      transferred to Seven Heavens, LLC?
11 A.   Plead the Fifth.
12 Q.   Mr. Miller, did you have any conversations or
13      communications with Rudy Helmuth concerning the
14      sale of property in Middlebury, Indiana, that
15      occurred shortly after this bankruptcy was filed,
16      which was a commercial property that we talked
17      about at this previous --
18 A.   I plead the Fifth.
19 Q.   Who is Sarah Helmuth?
20 A.   I plead the Fifth.
21 Q.   Is Sarah Helmuth Rudy Helmuth's daughter?
22 A.   I plead the Fifth.
23 Q.   Is Sarah Helmuth a former employee of 5 Star?
24 A.   I plead the Fifth.
25 Q.   Is Sarah Helmuth the person that created the

Page 69

1       notes and investment packages for 5 Star
2       entities?
3  A.   I plead the Fifth.
4  Q.   Mr. Miller, did any 5 Star investment funds go to
5       North Stream Ministries?
6  A.   I plead the Fifth.
7  Q.   Mr. Miller, is it true that all funds that were
8       paid to Matt Gingerich came from 5 Star and from
9       the 5 Star entities?
10 A.   I plead the Fifth.
11 Q.   Mr. Miller, I've seen photographs of you with an
12      airplane of some sort.  Was that airplane
13      acquired with 5 Star money?
14 A.   I plead the Fifth.
15 Q.   Do you presently have in your possession any
16      property, any money, anything that was acquired
17      using 5 Star money?
18 A.   You know what?  That has to do with intent, so
19      I'm going to answer that question.  That was not
20      bought with 5 Star money.
21 Q.   What was not bought with 5 Star money?
22 A.   That airplane was not bought with 5 Star money.
23      It was not bought with investor funds of 5 Star.
24 Q.   And where did it come from?
25 A.   I bought it.

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,  on 11/15/2016

Pages 70..73

Page 70

1  Q.   Where did you get the money from?
2  A.   I had funds.
3  Q.   Compensation from 5 Star?
4  A.   Yes.
5  Q.   You didn't work for anything other than 5 Star?
6  A.   No.
7  Q.   Where is that airplane?
8  A.   I plead the Fifth.
9  Q.   Mr. Miller, what was your compensation package
10      for 5 Star?
11 A.   I plead the Fifth.
12 Q.   What was Mr. Gingerich's compensation when he
13      worked for 5 Star?
14 A.   I plead the Fifth.
15 Q.   Mr. Miller, did 5 Star investment money --
16      investors' money go toward the failed purchase of
17      a property in Ohio called the NASA building?
18 A.   I plead the Fifth.
19 Q.   Were your partners in that Mr. Foraker?
20 A.   I plead the Fifth.
21 Q.   Also was involved, I think, another Realtor
22      person by the name of Williams?
23 A.   I plead the Fifth.
24 Q.   Do you recall his involvement?  And how much
25      money was transferred as part of that purchase?

Page 71

1  A.   I plead the Fifth.
2  Q.   Would it refresh your memory if it was over
3       $200,000?
4  A.   I plead the Fifth.
5  Q.   That was investor money, Mr. Gingerich?
6       Mr. Miller, excuse me.  Getting tongue-tied.
7       Sorry.
8  A.   Plead the Fifth.
9  Q.   I apologize.  Mr. Miller, do you also own an
10      entity called EP Miller & Associates?
11 A.   I plead the Fifth.
12 Q.   Mr. Miller, do you also have another entity
13      called EM Holdings, LLC?
14 A.   I plead the Fifth.
15 Q.   Mr. Miller, do you have any interest in an entity
16      called MLN Properties, LLC?
17 A.   I plead the Fifth.
18 Q.   Those entities I just mentioned, were any 5 Star
19      investor money transferred to those entities?
20 A.   I plead the Fifth.
21 Q.   Mr. Miller, did you have an ownership interest in
22      a Nevada corporation?
23 A.   I plead the Fifth.
24 Q.   That ownership in that corporation included Matt
25      Gingerich and Mr. Bontrager?

Page 72

1  A.   I plead the Fifth.
2  Q.   Mr. Miller, do you have any documents in your
3       possession concerning the transfer of
4       Mr. Gingerich's ownership interest in the 5 Star
5       entities to you?
6  A.   I plead the Fifth.
7  Q.   Do you know of anyone who has the documents
8       concerning that transaction?
9  A.   I plead the Fifth.
10 Q.   Did you acquire life insurance in your own name
11      using 5 Star investor money?
12 A.   I plead the Fifth.
13 Q.   Mr. Miller, was 5 Star investor money used to pay
14      the buyout from Mr. Bontrager?
15 A.   I plead the Fifth.
16 Q.   Did 5 Star entities invest in any business in
17      which Mr. Rudy Helmuth was a principal?
18 A.   I plead the Fifth.
19 Q.   Did 5 Star invest money -- was any 5 Star
20      investor money used to invest in businesses
21      co-owned by Marlin Schwartz?
22 A.   I plead the Fifth.
23 Q.   Mr. Miller, did you have any ownership interest
24      in R & M Holdings, LLC?
25 A.   I plead the Fifth.

Page 73

1  Q.   Any interest -- did any 5 Star investment money
2       go into Legacy Assets, LLC?
3  A.   I plead the Fifth.
4  Q.   Did any 5 Star money go into Creative Funding,
5       LLC?
6  A.   I plead the Fifth.
7  Q.   Did any 5 Star investor money go into Schwartz
8       Remodeling, LLC?
9  A.   I plead the Fifth.
10 Q.   Did any 5 Star investor money get transferred to
11      Premier Property Managers, LLC?
12 A.   I plead the Fifth.
13 Q.   Did any 5 Star investor money -- was any 5 Star
14      investor money transferred to Premier Transport
15      Group, LLC?
16 A.   I plead the Fifth.
17 Q.   Do you have any -- does 5 Star still have any
18      ownership interest in an entity that was
19      previously called 5 Star XYZ, LLC?
20 A.   I plead the Fifth.
21 Q.   Does 5 Star have any interest, ownership
22      interest -- any of the 5 Star entities have any
23      ownership interest in that entity which is now
24      called InfoLink, LLC?
25 A.   I plead the Fifth.

EXHIBIT 4

Page 74

1  Q.   Mr. Miller, did you authorize the employees of 5
2       Star to make the distributions to the investor?
3  A.   I plead the Fifth.
4  Q.   Mr. Miller, did you sign the checks that were
5       paid to the 5 Star investors?
6  A.   I plead the Fifth.
7  Q.   Mr. Miller, were you the signatory on all the
8       bank accounts for the 5 Star entities?
9  A.   I plead the Fifth.
10 Q.   Mr. Miller, did you transfer over $750,000 of 5
11      Star investor money to Global Impact Companies,
12      LLC?
13 A.   I plead the Fifth.
14          ASSISTANT TRUSTEE ROBERTS:  If I could just
15      interrupt.
16          MR. KOS:  Yeah.
17          ASSISTANT TRUSTEE ROBERTS:  Mr. Miller, that
18      information is disclosed on the schedules of
19      the various debtors.
20          THE WITNESS:  Then why is the question being
21      asked?
22          ASSISTANT TRUSTEE ROBERTS:  Mr. Kos is
23      asking questions about the finances of the
24      debtors.  And if you will recall, you've
25      answered questions about the Global Impact

Page 75

1       transfers previously.  So I would suggest
2       that you've waived the Fifth in this line of
3       questioning.
4          Mr. Kos, if you'd like to resume.
5  Q.   (By Mr. Kos) Sure.  So you did transfer 5 Star
6       investor moneys to Global Impact?  And for what
7       did Global Impact do to warrant a $750,000
8       payday?
9  A.   Global really helped us out in restructuring.
10      Again, we're not allowed to execute.  So they
11      were able to help us, you know, do all that stuff
12      and restructure.  Again, as I stated many times
13      in even the other ones, Global helped us to --
14      we're going to go after Gingerich.  We're going
15      to sue Toth and Foraker.  We're going to sue
16      Randy.  We had all the lawsuits ready.  We
17      were -- we had appointments set up with investors
18      to give them their collateral, their real estate
19      back.  We had the documents drafted to give
20      ownership in both Twin City and Village because
21      there were some notes in Village as well.  So we
22      were going to give those investors their
23      ownership.  Global got paid not all of it at one
24      time.  They got paid on the front side a
25      retainer, and then they got paid from the cash

Page 76

1       flow that we got from the houses on a monthly
2       basis.
3  Q.   And do you have any work product or record that
4       shows what, in fact -- what they did?
5  A.   You have all of it.  They gave all of it to you.
6       Have you not spoken with them yet?  There's not
7       one phone call to Global yet with you guys?  Not
8       one phone call?
9  Q.   There's a subpoena --
10 A.   A subpoena?
11 Q.   -- that has not been answered.
12 A.   We don't know what they did.  You don't know
13      where they were.  I mean, usually a trustee will
14      reach out and get information from --
15 Q.   And we have.
16 A.   -- the previous team and get the information,
17      so...
18          MR. ADELSPERGER:  You need another
19      statement?  Because I can make one right
20      off.
21          THE WITNESS:  Well --
22          MR. ADELSPERGER:  If someone will not
23      respond to a subpoena, how can I trust a
24      phone call?  Now, are you going to take the
25      Fifth to that, or are you going to answer

Page 77

1       that question?  I'm serious.  If someone
2       will not answer a subpoena, how can I trust
3       a phone call?
4          MR. THOMPSON:  Mr. Trustee, when you say --
5       can you give it some context?  When you're
6       saying when someone will not trust -- are
7       you talking about a specific instance?
8          MR. ADELSPERGER:  Yeah.  Yeah.  The instance
9       that he just questioned me on.  If my
10      counsel -- I'll be very specific.  If my
11      counsel sends a subpoena to Global and its
12      owners and they fail to respond by even
13      saying, "No, we're not giving it to you,"
14      they just don't respond, how can you assume
15      that I can trust a phone call?
16          MR. THOMPSON:  Can I have a minute to confer
17      with my client?
18          MR. ADELSPERGER:  No.  I got a pending
19      question.
20          MR. THOMPSON:  Yeah.  So okay.  Then I'm
21      going to assert an objection.
22          MR. ADELSPERGER:  Sure.
23          MR. THOMPSON:  And the objection is:  You're
24      asking a question beyond -- that doesn't
25      even go to the scope of his personal

**EXHIBIT 4**

Page 78

1    knowledge.  There's no way he can know the
2    answer to that because you're asking him to
3    answer on behalf of Global.  I mean, he
4    didn't send the subpoena.  They didn't
5    respond to it.  You're not talking about
6    something that he didn't respond to.
7        MR. ADELSPERGER:  The objection is duly
8    noted.  Are you advising him not to answer
9    the question?
10       MR. THOMPSON:  I'm going to allow him to
11   answer as he sees fit.
12       MR. ADELSPERGER:  There you go.
13 A.  So when did you send a subpoena out?
14       EXAMINATION OF EARL D. MILLER
15 BY MR. ADELSPERGER:
16 Q.  I'm not going to answer your question with a
17   question.  How can I trust a phone call?
18 A.  All the documents from Global -- you got all of
19   those directly from -- you got them directly from
20   Cozen O'Connor, and they did a conference call
21   with you to help you understand it.
22 Q.  When did this occur?
23 A.  Right after you took over.
24 Q.  And who told you that it happened?
25 A.  I don't remember.

Page 79

1  Q.  But it happened?
2  A.  I believe it did, yeah.
3  Q.  Okay.  So it happened or you believe it happened?
4  A.  I was told from Cozen that -- I think it was
5    Cozen that told me that it happened.
6  Q.  Did they tell you who talked with whom?
7  A.  They didn't give me all the specifics.
8  Q.  When was the last time you spoke with anyone from
9    Cozen?
10 A.  About 30 days ago.
11 Q.  Who was it?
12 A.  And I don't remember who it was.  He didn't tell
13   me at that time.
14 Q.  It was a he?
15 A.  Yeah.  They didn't tell me at that time.  You
16   know, they did not tell me -- the last time I
17   spoke with them is not when we had this
18   conversation of what we're indicating here.
19 Q.  What was the purpose of the phone call?
20 A.  I plead the Fifth.
21       ASSISTANT TRUSTEE ROBERTS:  Can I --
22       MR. ADELSPERGER:  We're still on the same
23   topic.
24       ASSISTANT TRUSTEE ROBERTS:  It is on the
25   same topic.

Page 80

1        MR. ADELSPERGER:  Go ahead.
2        ASSISTANT TRUSTEE ROBERTS:  It's about, it's
3    about Global and Cozen.
4        EXAMINATION OF EARL D. MILLER
5  BY ASSISTANT TRUSTEE ROBERTS:
6  Q.  At the first meeting of creditors, Mr. Miller,
7    you testified that Global Impact took money that
8    had been paid to them by you using 5 Star funds
9    from the 5 Star companies.  And used that to pay
10   Cozen O'Connor some of their legal fees.  Can you
11   confirm that that is the case?
12 A.  I don't remember that.  So many questions.
13 Q.  Do you know whether or not, in fact, Global paid
14   money to Cozen O'Connor?
15 A.  I don't remember.  It's been a year ago.  Yeah.
16 Q.  Do you know what Global did with the $750,000
17   that was paid to them by the 5 Star entities?
18 A.  I don't.
19       EXAMINATION OF EARL D. MILLER
20 BY MR. ADELSPERGER:
21 Q.  Are you personally represented by any lawyer at
22   Cozen or the Cozen firm right now?
23 A.  I plead the Fifth.
24 Q.  Have you used any investor funds to hire Cozen or
25   any other lawyer to represent your personal

Page 81

1    interest?
2  A.  I plead the Fifth.
3  Q.  From the date that you began work with the 5 Star
4    entities until the day that you left the
5    employment of the 5 Star entities, was -- is it
6    fair to say that 5 Star was your sole source of
7    income?
8  A.  I plead the Fifth.
9  Q.  Michael Alfrey is a former employee of the 5 Star
10   entities; is that correct?
11 A.  I plead the Fifth.
12 Q.  Isn't it true that he departed employment of the
13   5 Star entities on July 24, 2015, because Adam
14   LaFavre from Global was representing your
15   personal interests and not the interest of 5 Star
16   or any of its entities?
17 A.  I plead the Fifth.
18 Q.  Isn't it true that during that time frame when
19   Global came in and took over operations of 5
20   Star, that you were nowhere to be found?
21 A.  I plead the Fifth.
22 Q.  Isn't it true that on that -- in that time frame,
23   not only were you nowhere to be found, but you
24   disconnected all forms of communications with 5
25   Star and its employees via communication by cell

Page 82

1           phone, home phone, e-mail, text, or any other
2           forms of communication?
3    A.    I plead the Fifth.
4    Q.    Isn't it true that you instructed Adam LaFavre
5           and Global to tell the employees on or about July
6           20 that they were in charge and they were calling
7           all the shots and you were no longer available
8           for comment?
9    A.    I plead the Fifth.
10              MR. ADELSPERGER:  Go ahead.
11              EXAMINATION OF EARL D. MILLER
12   BY MR. KOS:
13   Q.    Mr. Miller, when was the last time you spoke to
14          Adam LaFavre?
15   A.    I plead the Fifth.
16   Q.    Have you seen Mr. LaFavre since the bankruptcies
17          were filed?
18   A.    I plead the Fifth.
19   Q.    You visited Mr. LaFavre at his property in
20          Colorado, Buena Vista, Colorado?
21   A.    I plead the Fifth.
22   Q.    What did Mr. LaFavre do to earn the $750,000?
23   A.    I plead the Fifth.
24   Q.    What did Mr. Scott Bocklund do?
25   A.    I plead the Fifth.

Page 83

1    Q.    Who was Brandon Bellamy?
2    A.    I plead the Fifth.
3    Q.    Were any other transfers of property other than
4           money made to Global Impact Companies?
5    A.    I plead the Fifth.
6    Q.    Did 5 Star entities have any other bank accounts
7           other than those that were disclosed in the
8           bankruptcy schedules as having been at Interra
9           Credit Union and Wells Fargo bank?
10   A.    I plead the Fifth.
11   Q.    Mr. Miller, is it true that you used
12          instrumentalities of public communication --
13          telephone, e-mail, fax -- to defraud the
14          investors of 5 Star?
15   A.    No, that is not true.
16   Q.    Did you make inquiries with investors, for the
17          investors, other than telephone?
18   A.    I did.  I talked to investors on the phone.
19   Q.    Did you accept funds from them by wire transfer?
20   A.    I plead the Fifth.
21   Q.    Did you use the instrumentality of the United
22          States Postal Service in the furtherance of your
23          business enterprise of 5 Star entities --
24   A.    I plead the Fifth.
25   Q.    -- and defrauding of creditors?

Page 84

1           Mr. Miller, do you have any investment in
2           Grand Products, LLC?
3    A.    I plead the Fifth.
4    Q.    Did any 5 Star investment money go to Grand
5           Products, LLC?
6    A.    I plead the Fifth.
7    Q.    Did you have any part in the patenting of
8           something called the Torch Knife?
9    A.    I plead the Fifth.
10   Q.    Mr. Miller, you earlier said that Global had
11          helped prepare various lawsuits.  Can you provide
12          more detail concerning what lawsuits and who has
13          the pleadings concerning those lawsuits and what
14          were the grounds of those lawsuits?  Take the
15          time and the effort, as much as you can.
16   A.    The lawsuits were never sent out because we're
17          not allowed to execute.  So lawsuits were to Toth
18          and Foraker for being defrauded.  They were from
19          being defrauded from Portland.  This was all
20          after the discovery.  They discovered that.  And
21          from Gingerich as well.
22   Q.    Okay.  And what lawyer or law firms prepared
23          those?
24   A.    Cozen O'Connor.
25   Q.    Any particular lawyer at Cozen O'Connor?

Page 85

1    A.    I don't know for sure who did those.
2    Q.    Who introduced you to Cozen O'Connor?
3    A.    I plead the Fifth.
4    Q.    Did Cozen O'Connor have a prior relationship with
5           Global Impact Companies?
6    A.    I plead the Fifth.
7    Q.    Mr. Miller, did you transfer any of the 5 Star
8           investors' money to either of the Zupetzes?
9    A.    I plead the Fifth.
10   Q.    Did you transfer any 5 Star investor money to
11          Jason Chandler?
12   A.    I plead the Fifth.
13   Q.    Did you transfer any 5 Star investment money to
14          Allison and Andrew Pust, P-U-S-T?
15   A.    I plead the Fifth.
16   Q.    Was 5 Star investor money used to acquire 63700
17          County Road 31, Goshen, Indiana 46526?
18   A.    I plead the Fifth.
19   Q.    Mr. Miller, are you aware of any other assets,
20          whether they be personal property, real property,
21          intangible property, that belongs to 5 Star --
22          any of the 5 Star entities that's not listed on
23          the bankruptcy schedules?
24   A.    No.  I'm not aware of it.
25   Q.    Are all the intercompany loans accurately

**EXHIBIT 4**

Page 86

1     reflected in the schedules that have been filed?
2  A.   I plead the Fifth.
3  Q.   Mr. Miller, did you prepare the prospectuses that
4     were provided to the 5 Star investors?
5  A.   I plead the Fifth.
6  Q.   Did you read and review the information that was
7     contained in all the prospectuses that were given
8     to the 5 Star investors?
9  A.   I plead the Fifth.
10  Q.   Was the information contained in those
11     prospectuses true and accurate to the best of
12     your knowledge?
13  A.   I plead the Fifth.
14  Q.   Mr. Miller, did 5 Star -- any of the 5 Star
15     entities receive cash from the various tenants or
16     persons that it dealt with?
17  A.   I plead the Fifth.
18  Q.   Has all the cash that was received by 5 Star been
19     adequately and properly accounted for?
20  A.   I plead the Fifth.
21  Q.   Mr. Miller, have you transferred any assets to
22     any family member?
23  A.   I plead the Fifth.
24  Q.   Transferred assets to any other person that we've
25     not described or identified so far today?

Page 87

1  A.   I plead the Fifth.
2  Q.   Mr. Miller, did any 5 Star investor money go into
3     JC Capital Fund Trust?
4  A.   I plead the Fifth.
5  Q.   Mr. Miller, did any 5 Star investor money go into
6     Bass Finders, LLC?
7  A.   I plead the Fifth.
8  Q.   Mr. Miller, did any 5 Star investor money go into
9     Born to Win Trust?
10  A.   I plead the Fifth.
11  Q.   Mr. Miller, do you have any knowledge of an
12     entity called Helmuth Investments, LLC?
13  A.   I plead the Fifth.
14  Q.   Did any 5 Star investor money go into Helmuth
15     Investments, LLC?
16  A.   I plead the Fifth.
17       ASSISTANT TRUSTEE ROBERTS:  Can you speak
18     up, please?
19  Q.   (By Mr. Kos) Earlier I asked about a Realtor. I
20     couldn't remember his name.  William E.
21     Gallagher.  Regarding the NASA building.  Were
22     you aware that he had an ownership in the
23     building that was being sold?
24  A.   I plead the Fifth.
25       (Break in audio recording)

Page 88

1     ASSISTANT TRUSTEE ROBERTS:  All right.  We
2     are back on the record.  These are the
3     continued 341 meetings of the 5 Star
4     debtors.
5       Mr. Miller, again, you continue to be
6     under oath.  Mr. Kos has finished his
7     questions for right now.  Oh, you have one
8     more.
9     MR. KOS: I'm sorry.  One more.
10     ASSISTANT TRUSTEE ROBERTS:  Go ahead.
11       EXAMINATION OF EARL D. MILLER
12 BY MR. KOS:
13  Q.   Mr. Miller, if you can tell us, do you know what
14     the maximum amount of money was invested in the
15     properties in Portland, Oregon?
16  A.   I plead the Fifth.
17     MR. KOS:  Okay.
18     ASSISTANT TRUSTEE ROBERTS:  Okay.  And you
19     had some questions?
20     MR. HORN:  Yes, ma'am.  I'm George Horn.
21     I'm counsel for Matt Gingerich.
22       EXAMINATION OF EARL D. MILLER
23 BY MR. HORN:
24  Q.   Mr. Miller, I have a few questions, if you would
25     please.  It is true -- is it not?  -- that on or

Page 89

1     about July 29th, 2014, you entered into a unit
2     purchase agreement with Mr. Gingerich whereby the
3     purchase was 50 percent interest in what we'll
4     refer to as the 5 Star entities?
5  A.   I plead the Fifth.
6  Q.   And prior to entering into that unit purchase
7     agreement with Mr. Gingerich, you had access to
8     the 5 Star financial (inaudible) position with
9     the companies, correct?
10  A.   I plead the Fifth.
11  Q.   And you entered into the agreement with
12     Mr. Gingerich, agreeing to pay him two and a half
13     million dollars for his 50 percent interest in
14     the company because you believed that was a fair
15     amount given your access to financials at that
16     time, correct?
17  A.   I plead the Fifth.
18     MR. ADELSPERGER:  Sir, speak up, please.
19     I'm sorry.
20  A.   Okay.  I plead the Fifth.
21  Q.   (By Mr. Horn) And, in fact, you had such
22     confidence in the financial stability of the 5
23     Star entities, you agreed to make payments to
24     Mr. Gingerich over a period of ten years,
25     correct?

**EXHIBIT 4**

Page 90

1   A.   I plead the Fifth.
2   Q.   Mr. Miller, when some of the apartment complexes
3        that 5 Star had invested in were sold,
4        acquisition fees were paid at the time those
5        sales went through, correct?
6   A.   I plead the Fifth.
7   Q.   And you received some of those acquisition fees
8        personally and kept them for your own, correct?
9   A.   I plead the Fifth.
10  Q.   Did any of those acquisition fees ultimately go
11       back to 5 Star?
12  A.   I plead the Fifth.
13  Q.   There came a point in time where you invested 5
14       Star money with a company called Green Resource
15       Homes, correct?
16  A.   I plead the Fifth.
17  Q.   And you did that without investor permission,
18       correct?
19  A.   I plead the Fifth.
20  Q.   You had an ownership interest in Green Resource
21       Homes along with Mr. Toth and Mr. Foraker,
22       correct, Mr. Miller?
23  A.   I plead the Fifth.
24  Q.   And Green Resource Homes at some point in about
25       2015 purchased a property located at 420 Main in

Page 91

1        Middlebury, Indiana, correct?
2   A.   I plead the Fifth.
3   Q.   And you had an ownership interest in Green
4        Resource Homes at the time that purchase was
5        made, correct?
6   A.   I plead the Fifth.
7   Q.   Green Resource Homes purchased that property for
8        $550,000, give or take, correct?
9   A.   I plead the Fifth.
10  Q.   And Green Resource Homes purchased that property
11       from a company known as RSR, am I correct?
12  A.   I plead the Fifth.
13  Q.   And the $550,000 paid by Green Resource Homes for
14       that property was $200,000 more than had been
15       previously paid for that property when it had
16       sold two times prior to Green Resource Homes
17       purchasing it, correct?
18  A.   I plead the Fifth.
19  Q.   And Green Resource Homes, in fact, was laundering
20       money through that building for purposes of
21       paying that inflated price of $550,000; is that
22       correct?
23  A.   I plead the Fifth.
24  Q.   The funds used -- let me back up for a second.
25       At some point after Green Resource Homes

Page 92

1        purchased that property, the property was sold to
2        H & H; is that correct?
3   A.   I plead the Fifth.
4   Q.   And that sale was made through your partners at
5        Green Resource Homes, Mr. Toth and Mr. Foraker,
6        to H & H, correct?
7   A.   I plead the Fifth.
8   Q.   And at the time they were involved in that sale
9        to H & H of the 420 Main Street property, they
10       had legal authority to act on behalf of Green
11       Resource Homes?
12  A.   I plead the Fifth.
13  Q.   Let me go back for a second.  When you entered
14       into the unit purchase agreement with
15       Mr. Gingerich, you entered into it voluntarily,
16       correct?
17  A.   I plead the Fifth.
18  Q.   And prior to entering into it, on at least a
19       monthly basis, you had access to the company
20       financials of 5 Star, the 5 Star entities,
21       correct?
22  A.   I plead the Fifth.
23  Q.   You also had access to the accountant,
24       Mr. Geiger, to review those financials at any
25       point in time should you so desire prior to the

Page 93

1        purchase of Mr. Gingerich's interest, correct?
2   A.   I plead the Fifth.
3   Q.   And as part of the payments you made to
4        Mr. Gingerich -- well, let me back up.
5            Under the uniform purchase -- excuse me --
6        unit purchase agreement, that was a personal
7        obligation which you had to Mr. Gingerich to pay
8        him that two and a half million dollars over ten
9        years, correct?
10  A.   I plead the Fifth.
11  Q.   And within the first year or so, you paid
12       Mr. Gingerich approximately 1.6 of the
13       $2.5 million you owed him, correct?
14  A.   I plead the Fifth.
15  Q.   And part of those funds came from your own
16       personal funds, correct?
17  A.   I plead the Fifth.
18  Q.   And part of those funds that were paid to
19       Mr. Gingerich came from money that Mr. Schwartz
20       paid you for an ownership interest in the 5 Star
21       entities?
22  A.   I plead the Fifth.
23  Q.   And part of those funds paid to Mr. Gingerich
24       included a distribution from 5 Star to you that
25       was recorded on the 2014 tax return of the

Page 94

1    entity, correct?
2  A.   I plead the Fifth.
3  Q.   You are currently in default of your agreement
4       with Mr. Gingerich under the unit purchase
5       agreement, correct?
6  A.   I plead the Fifth.
7  Q.   When the Sungate property was sold for two and a
8       half million dollars, was an acquisition fee
9       received?
10  A.   I plead the Fifth.
11  Q.   Did you personally keep the acquisition fee
12       receipt for the Sungate property?
13  A.   I plead the Fifth.
14  Q.   It is correct -- is it not?  -- that you declined
15       to pay the investors in the Sungate property the
16       amount they were due when the property was sold?
17  A.   I plead the Fifth.
18  Q.   There were other property sales where 5 Star was
19       entitled to receive an acquisition fee aside from
20       Sungate; is that correct?
21  A.   I plead the Fifth.
22  Q.   You have not made any efforts to recover money
23       from Global that was paid to them, have you,
24       Mr. Gingerich -- or see, I'm getting like Ed.
25       Have you, Mr. Miller?

Page 95

1  A.   I plead the Fifth.
2  Q.   Global did not complete all of the work they were
3       paid to do with that $750,000, correct?
4  A.   I plead the Fifth.
5  Q.   With regard to access to the financials of 5 Star
6       prior to the sale of Mr. Gingerich's interest to
7       you, you actually had monthly meetings with
8       Mr. Geiger to review the financials of the
9       company, correct?
10  A.   I plead the Fifth.
11  Q.   Mr. Miller, what documents did you review to
12       refresh your memory related to your testimony
13       here today?
14  A.   I plead the Fifth.
15  Q.   With regard to the company that owned the 420
16       Main Street property in Middlebury, before it was
17       purchased by Green Resource Homes, RSR, what do
18       you know about that company?
19  A.   I plead the Fifth.
20  Q.   Do you know who owned the company?
21  A.   I plead the Fifth.
22  Q.   Can you tell us why Green Resource Homes paid
23       $550,000 for the property when the two prior
24       sales never were above $350,000 for that
25       property?

Page 96

1  A.   I plead the Fifth.
2       MR. HORN:  That's all I have.  Thank you.
3       ASSISTANT TRUSTEE ROBERTS:  Trustee
4       Adelsperger.
5       EXAMINATION OF EARL D. MILLER
6  BY MR. ADELSPERGER:
7  Q.   Mr. Miller, just following up, a couple of
8       questions on that particular line of questions.
9       Isn't it true that Mr. Gingerich instructed
10       you to account for the payments that were made to
11       him for the purchase of that stock as
12       distributions to you from the company?
13  A.   I plead the Fifth.
14  Q.   Isn't it true that all of the funds that went to
15       Mr. Gingerich stemmed -- for the purchase of his
16       stock or the sale of his stock to you, were from
17       investor money?
18  A.   I plead the Fifth.
19  Q.   Isn't it true that the transfer of the Middlebury
20       property that was just discussed occurred after
21       the SEC put in place a freeze of distributing or
22       selling any properties owned by 5 Star or you?
23  A.   I plead the Fifth.
24       MR. ADELSPERGER:  I have no further
25       questions.  Does any of my counsel have any

Page 97

1       questions?  Unsecured creditors committee
2       have any questions?
3       MR. JONAS:  Nothing further.
4       ASSISTANT TRUSTEE ROBERTS:  Okay.  I do have
5       a couple of questions.
6       EXAMINATION OF EARL D. MILLER
7  BY ASSISTANT TRUSTEE ROBERTS:
8  Q.   You were just asked some questions regarding your
9       relationship with Global Impact.  Did you, did
10       you personally ever receive any money from Global
11       Impact?
12  A.   I plead the Fifth.
13  Q.   Did you personally receive any money from Global
14       Impact after the bankruptcy cases were filed?
15  A.   I plead the Fifth.
16  Q.   Did you personally receive any money from Adam
17       LaFavre?
18  A.   I plead the Fifth.
19  Q.   Did you personally receive any money from Adam
20       LaFavre after the bankruptcy cases were filed?
21  A.   I plead the Fifth.
22  Q.   Did you personally receive any money from Z
23       Ministries after the bankruptcy cases were filed?
24  A.   I plead the Fifth.
25  Q.   Did you personally receive any money from the

**EXHIBIT 4**

Page 98

1        Zupetzes after the bankruptcy cases were filed?
2  A.    I plead the Fifth.
3  Q.    Did you personally receive any money from
4        Mr. Toth after the bankruptcy cases were filed?
5  A.    I plead the Fifth.
6  Q.    Did you personally receive any money from
7        Mr. Foraker after the bankruptcy cases were
8        filed?
9  A.    I plead the Fifth.
10           ASSISTANT TRUSTEE ROBERTS:  I have no
11        further questions today.  I reserve the
12        right to continue further questions.  We
13        will adjourn the meeting of creditors, and
14        we reserve the right at this time to conduct
15        one further potential meeting of creditors.
16        If, in fact, there is a decision to continue
17        and to hold a further meeting of creditors,
18        notice will go out.  You will all receive at
19        least 30 days' notice.  At this time, I'm
20        going to close the meeting for today.  And
21        we are off the record on November 15th,
22        2016.
23           (Break in audio recording)
24        MR. ADELSPERGER:  Hold on, hold on.  We're
25        going to make a technical correction.

Page 99

1  ASSISTANT TRUSTEE ROBERTS:  Yes.  Back on
2  the record for the continued 341 meeting of
3  the 5 Star debtors.  We're going to continue
4  the meeting and --
5  MR. ADELSPERGER:  No.  No.  We're requesting
6  that the meeting be adjourned and concluded.
7  Any further investigation of Mr. Miller or
8  anything else would have to come under Rule
9  2004 of the bankruptcy code and not, and
10  not --
11  UNIDENTIFIED FEMALE VOICE:  For the federal
12  rules.
13  MR. ADELSPERGER:  Oh, the federal rules.
14  Exactly.  But not through a 341 meeting.
15  ASSISTANT TRUSTEE ROBERTS:  All right.  That
16  being said, the 341 meeting is concluded.
17  MR. ADELSPERGER:  Adjourned and concluded.
18  Thank you.
19     (End of audio recording)
20
21
22
23
24
25

Page 100

1           C E R T I F I C A T E
2
3     I, Tonya J. Kaiser, a Notary Public, authorized to
4  take and certify transcriptions, do hereby certify that
5  the foregoing transcript was transcribed to the best of
6  my ability from an audio recording.
7
8     IN WITNESS WHEREOF, I have set my hand and seal this
9  2nd day of December, 2016.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TONYA J. KAISER
NOTARY PUBLIC—OFFICIAL SEAL
State of Indiana, County of Allen
My Commission Expires 04/13/2018

5 Star Investment Group
341 Meeting,   on 11/15/2016

**$**

**$1.4** 50:1

**$1.9** 52:18 54:4

**$10,000** 59:18,24

**$15,000** 60:1

**$2** 48:25 50:1

**$2.5** 93:13

**$200,000** 50:23 71:3 91:14

**$25,000** 59:23

**$350,000** 95:24

**$550,000** 91:8,13,21 95:23

**$600,000** 49:15

**$7.1** 45:11

**$7.5** 45:5

**$750,000** 74:10 75:7 80:16 82:22 95:3

**1**

**1** 20:10

**1.4** 49:4

**1.6** 93:12

**10,000** 59:23

**100** 52:8

**10:00** 4:4

**11** 4:24 5:2,20 6:25 17:10 20:10,13,15
21:14,16 24:19 32:4 34:2 43:25 54:13

**125,000** 37:23

**12:45** 8:25

**13th** 46:1

**14th** 14:18

**15** 4:3 21:1 37:25 48:23

**15th** 98:21

**16-30078** 4:8

**16-30079** 4:9

**16-30080** 4:10

**16-30081** 4:11

**16-30082** 4:13

**16-30083** 4:14

**16-30084** 4:15

**16-30085** 4:16

**16-30086** 4:18

**16-30087** 4:19

**16-30088** 4:20

**19th** 48:10

**2**

**20** 82:6

**2012** 40:13

**2014** 89:1 93:25

**2015** 9:8 11:3 12:19,20 14:1 37:14,23
39:6 44:22 45:5 49:6 57:10,15,19,25
64:8 66:13 81:13 90:25

**2016** 4:3 5:10,12 43:11 46:1 48:10,23
54:24 55:1 98:22

**21st** 5:12

**24** 43:11 81:13

**29** 3:7

**29th** 5:10 89:1

**3**

**30** 21:2 79:10 98:19

**304** 40:17

**31** 85:17

**341** 4:5 6:17 17:4,5,15 31:24 34:1,11
53:19,21 88:3

**343** 17:15

**35** 3:8

**37** 3:9

**38** 3:10

**39** 3:11,12

**4**

**40** 3:13

**420** 90:25 92:9 95:15

**46526** 85:17

**5**

**5** 4:6,8,9,10,11,13,14,15,16,18,19
11:21,24 12:5,6,8,11,14,16 13:3,7
14:3,24 22:25 23:4,9,13 24:11,15,22
25:1,13,17 26:2,5 27:12 30:20,21
32:21,23 33:4 34:2 35:2 36:12,24
38:14 39:3,19,23 40:3 44:3,5,11,18
45:1,7,20 48:21 52:20,23 54:4 56:5,19
57:11 58:1,14,17,18 59:1,7,24 61:24
62:6 63:1,5 64:10,13,16,19,22,25
65:3,6,9,12,15,18,21,24 66:2,4,6,8,10,
13,22 67:4,7,10,13,18,19,20,22,25
68:3,6,9,23 69:1,4,8,9,13,17,20,21,22,
23 70:3,5,10,13,15 71:18 72:4,11,13,
16,19 73:1,4,7,10,13,17,19,21,22
74:1,5,8,10 75:5 80:8,9,17 81:3,5,6,9,
13,15,19,24 83:6,14,23 84:4 85:7,10,
13,16,21,22 86:4,8,14,18 87:2,5,8,14
88:3 89:4,8,22 90:3,11,13 92:20
93:20,24 94:18 95:5 96:22

**50** 89:3,13

**51** 3:14

**573** 35:10

**6**

**600,000** 50:3

**63700** 85:16

**697** 35:16

**7**

**75** 14:20

**78** 3:15

**8**

**80** 3:16,17

**80863** 35:20

**80866** 35:13

**82** 3:18

**88** 3:19,20

**9**

**9** 3:6

**90** 48:19

**95** 52:14

**96** 3:21

**97** 3:22

---

**A**

**a.m.** 4:4

**absolute** 17:19 18:8,21,22,23

**absolutely** 16:7

**accept** 12:11,14,16 83:19

**accepted** 12:9 57:24 58:12

**access** 49:16 89:7,15 92:19,23 95:5

**Accordingly** 45:16

**account** 13:7 49:10,12,16,17 96:10

**accountant** 92:23

**accounted** 86:19

**accounts** 36:20,21 74:8 83:6

**accurate** 6:15 86:11

**accurately** 85:25

**Ace** 65:1

**acquire** 72:10 85:16

**acquired** 69:13,16

**acquisition** 90:4,7,10 94:8,11,19

**act** 92:10

**action** 30:8 47:19 51:3 53:16

**active** 36:16

**activity** 20:22,24

**Adam** 81:13 82:4,14 97:16,19

**Adamczyk** 35:1

**addition** 46:15 47:13

**additional** 7:3 48:5

**address** 8:6 28:13 35:9,10,16 40:21

**Adelsperger** 3:15,17,21 5:2 19:3,5,
14,18 20:5,8 21:7,12,23 26:13,16
28:9,12,18 29:1,5,8,19 33:11 34:17
42:21 51:15 53:20 60:16,19 76:18,22
77:8,18,22 78:7,12,15 79:22 80:1,20
82:10 89:18 96:4,6,24 98:24

**adequately** 86:19

**adjourn** 98:13

**administer** 7:13

**administrative** 5:18

**advance** 50:25

**advise** 14:12 27:16

**advised** 29:13,22

**advising** 15:21 31:8 78:8

**affairs** 5:16 17:24 22:14 32:1,17

**affirm** 7:21

**afford** 36:17

**after** 7:6 12:4,8 27:18 54:13 55:1
68:15 75:14 78:23 84:20 91:25 96:20
97:14,20,23 98:1,4,7

**agent** 12:22

**agreed** 47:24 89:23

**agreeing** 89:12

**agreement** 89:2,7,11 92:14 93:6
94:3,5

**agreements** 41:18,19

**ahead** 10:22 80:1 82:10 88:10

**airplane** 69:12,22 70:7

**Alan** 55:15

**Albion** 24:10 65:22,25

**Alfrey** 41:25 42:7 81:9

**Allison** 85:14

**allowed** 10:12,18 32:9 41:6,7,10,20
53:15 75:10 84:17

**Amendment** 9:18,22,23 10:12,19
15:23 18:24 28:1 29:15,23 30:7,16
31:5,9

**amount** 88:14 89:15 94:16

**Andrew** 7:18 26:3,19 85:14

**Andrews** 3:10 38:8,12

**answer's** 28:14

**answers** 51:9,10

**apartment** 22:24 23:3 35:24 44:19
46:12 47:6 49:6,9 55:3 90:2

**apartments** 23:13 24:2,6 44:13
50:17,19 54:20 63:2 64:11,14,17,20,
23 68:7

**apologize** 41:12 71:9

**apparently** 49:1

**applies** 31:5

**appointed** 5:2 22:10 48:7

**appointment** 46:25 47:17 48:3,9

**appointments** 75:17

**approximately** 49:15 50:22 93:12

**April** 44:10

**argument** 36:25

**Artisan** 14:20,23 61:20

**as-needed** 50:17

**Ashley** 22:23 64:14

**asleep** 35:15

**assert** 10:1,2,8 18:13 77:21

**asserted** 24:18

**Asset** 23:7 68:4

**assets** 17:21 28:23 31:14,18 37:1
63:24 73:2 85:19 86:21,24

**assist** 62:23

**assistant** 3:16,22 4:2 5:5 7:17,19 8:1,
5,10,20 9:20 10:20,24 11:6,10 13:12,
16,19,22 14:11 17:1,3,8 18:11 19:12,
17 21:11 22:2,7,18 27:6,13,23 28:11
29:16,20 31:16,22 32:12 33:17,25
34:16,18 36:6,9 37:3,7 38:5,22 40:8
51:14 74:14,17,22 79:21,24 80:2,5
87:17 88:1,10,18 96:3 97:4,7 98:10

**associated** 46:13

**Associates** 71:10

**assume** 29:13,21 30:12 77:14

**assumptions** 29:11 30:2

**assure** 20:23

**attempt** 57:16

**attempting** 32:11

**attention** 9:8

**attorney** 29:19 31:3 39:17 45:22

**attorney-client** 20:4

**attorneys** 26:10

**EXHIBIT 4**

**audience**  7:8 43:9

**audio**  33:24 87:25 98:23

**August**  46:22

**authority**  92:10

**authorize**  74:1

**Avalon**  22:24 64:20 65:7,15

**avenues**  46:8

**avoid**  47:17

**aware**  9:22 26:12 43:5 54:18,22 55:1 57:11 60:23 62:19 63:11 85:19,24 87:22

**awhile**  61:3

---

**B**

**Babenco**  47:3 50:12 55:12

**Babenco's**  63:15

**back**  21:4,17 22:3 33:21,25 38:19 39:11,13 43:17 53:25 75:19 88:2 90:11 91:24 92:13 93:4

**bad**  46:18

**Baker**  3:13 40:9,11

**balance**  47:12

**bank**  36:20,21,22 46:23 47:7,19,22 48:2 49:10,15,19,21 50:9,24 51:2 54:23 55:7 74:8 83:6,9

**bankruptcies**  20:10 23:10,14 54:14 58:23 82:16

**bankruptcy**  4:6,23,24 5:1,16 17:5,12, 16,17,19,20 18:4,17 22:5,8,15 23:5,21 24:8 25:5 27:16 31:17,25 32:4,5,6 35:4 36:14 42:3 43:4,6,25 44:4 45:2 68:15 83:8 85:23 97:14,20,23 98:1,4,7

**bankruptcy's**  48:8

**basis**  9:24 50:17 76:2 92:19

**Bass**  87:6

**Bedrock**  63:6,9,12,19

**beg**  10:21

**began**  44:13 45:6 81:3

**begin**  38:14

**beginning**  44:10

**behalf**  6:23 11:20,24 28:2,5 32:9 34:15 59:1 78:3 92:10

**believe**  79:2,3

**believed**  89:14

**Bellamy**  83:1

**belongs**  85:21

**Bend**  6:4 12:4 40:3,5

**benefit**  30:17 53:6

**bit**  42:18 51:24

**blank**  6:7

**blanket**  9:24

**Blue**  66:20,23

**Bob**  43:12,19 55:22

**Bocklund**  82:24

**Bontrager**  71:25 72:14

**Born**  87:9

**bought**  69:20,21,22,23,25

**Box**  35:10

**Bradenton**  67:2

**Brandon**  83:1

**break**  8:25 33:18,20,24 87:25 98:23

**briefly**  18:20 33:6

**bring**  21:4 57:21

**brought**  12:22 20:21 27:17 30:11 41:17 42:16

**Bruggeman**  24:14 46:13 47:1,2,9,14, 24 50:11 54:13,16,18 55:2,5

**Bruggeman's**  47:21

**Buena**  82:20

**Builders**  14:21,23 61:15,18,20

**building**  49:9 70:17 87:21,23 91:20

**bunch**  41:9

**business**  12:6 17:17 25:2,17,21,24 26:2 72:16 83:23

**businesses**  72:20

**buy**  47:20 50:13

**buying**  42:8

**buyout**  72:14

---

**C**

**California**  25:15

**call**  8:24 76:7,8,24 77:3,15 78:17,20 79:19

**called**  14:20 70:17 71:10,13,16 73:19, 24 84:8 87:12 90:14

**calling**  82:6

**can't**  9:24 20:1 33:9

**cannot**  6:16 19:19

**capacity**  17:9

**capital**  4:19 49:23 66:6 87:3

**capitalization**  66:15

**care**  41:22 43:10 45:21,23

**Carl**  47:2 55:9

**Carolina**  40:20,22 44:20 45:22 47:18 52:9 54:8 55:10,13,16,23 56:2,7,11,15 67:11,14

**Caruso**  49:25

**case**  4:7,9,10,11,12,13,15,16,17,19, 20 9:7 16:9 22:10 23:14 24:23 25:14, 21 26:22 27:18 31:12 32:4 46:13 49:8 80:11

**cases**  4:6,21,24 5:16 23:5,10,18,22, 25 24:4,8,12 25:2,5,9 32:4 34:2 43:25 97:14,20,23 98:1,4,7

**cash**  12:14 49:5,12 75:25 86:15,18

**Cassidy**  25:18

**CD**  6:7

**Cedar**  24:6

**cell**  81:25

**certain**  29:11 30:2 49:7

**Chandler**  85:11

**changes**  12:8

**Chapter**  4:24 5:2 6:25 34:2 54:13

**charge**  19:11 82:6

**charged**  16:2

**charges**  16:6

**charitable**  59:19

**Charleston**  24:3 63:3

5 Star Investment Group
341 Meeting,  on 11/15/2016

**Charlie** 25:10

**check** 12:17

**checks** 74:4

**choose** 50:14

**Christopher** 39:16

**Cities** 43:1 45:13,15 46:10 47:16
49:2,22 50:1,3,4,11 51:25 52:19 53:17
54:20,22

**City** 23:16 40:24 41:7,15,16 43:20,24
44:3,6,8,13,21 45:18,19 46:7,14
48:17,20 49:3,14,17,19 50:8,21 52:1,2
53:23 54:2 75:20

**civil** 16:11 18:24,25 30:8 31:12

**claim** 34:21,23 37:15,16 39:19 44:9

**claims** 35:2

**clarification** 24:18

**clarify** 27:9,15

**clear** 6:15 43:21

**client** 15:15,21 16:9,17,19 19:11 20:8
26:24 27:9 28:25 31:2,3 32:10 33:5,8,
19,20 34:21 77:17

**client's** 27:21

**clients** 40:1

**close** 48:25 98:20

**closed** 38:2

**closing** 49:2 50:2 52:12,13

**closings** 57:21

**co-owned** 72:21

**code** 4:6 17:6,16,20 18:8,17 22:8,16
31:25 32:5 35:13

**collateral** 75:18

**collect** 55:2

**collected** 10:15

**Colonial** 64:11

**Colony** 23:2

**Colorado** 35:11 82:20

**commence** 7:6,12 8:22 9:2

**commenced** 46:24

**comment** 18:21 42:23 82:8

**commentary** 31:1

**comments** 30:23

**commercial** 4:11 23:24 37:24 40:16,
19,23 41:13 42:2 44:4,5,11 45:23
48:21 68:16

**committed** 17:11

**committee** 7:5 8:22 9:6 16:1,11,21,
22 20:11 37:18,20 38:10 97:1

**communication** 81:25 82:2 83:12

**communications** 54:12 55:5,9,12,
15,18,20,22,25 68:13 81:24

**companies** 5:23 24:20 27:12 28:3
36:24 74:11 80:9 83:4 85:5 89:9

**company** 12:23 14:20 16:16 37:16
40:20,22 52:3,4,15 89:14 90:14 91:11
92:19 95:9,15,18,20 96:12

**compensation** 56:22 70:3,9,12

**complete** 95:2

**completely** 44:2

**complex** 22:24 24:10 44:19,24 45:4
46:18 47:6 49:6 50:14 55:3

**complexes** 23:3 46:12 90:2

**concerning** 55:6,10,13,16,23 56:1,6
64:4 68:13 72:3,8 84:12,13

**conclude** 6:16

**condition** 5:19 32:2

**conduct** 5:18 98:14

**conducted** 5:10 25:2 44:15

**confer** 28:25 33:5,9,18,20 77:16

**conference** 53:19,21 78:20

**conferring** 14:14

**confession** 46:2

**confidence** 89:22

**confidential** 46:17

**confirm** 80:11

**consent** 19:23

**consequences** 29:14,22

**considerable** 54:19

**consideration** 59:2

**consolidated** 4:25 5:3

**constitutional** 18:23

**contact** 8:6

**contacted** 46:11 47:1

**contained** 86:7,10

**context** 77:5

**continue** 5:14 6:17 12:6 18:18 22:20
50:25 51:3,20 88:5 98:12,16

**continued** 4:4 5:11,13,19 6:18,19
46:8 48:4 88:3

**continuing** 34:5

**contract** 59:10

**contracts** 14:23,24

**contributed** 49:5

**conversation** 42:16 79:18

**conversations** 27:3 68:12

**cooperate** 16:23 19:13 46:3

**copy** 6:7

**corporate** 31:6 37:2

**corporation** 71:22,24

**corporations** 31:7

**corporations'** 31:9

**correct** 8:8 11:3 47:5 81:10 89:9,16,
25 90:5,8,15,18,22 91:1,5,8,11,17,22
92:2,6,16,21 93:1,9,13,16 94:1,5,14,
20 95:3,9

**correction** 98:25

**correspondence** 43:19

**corroborating** 30:9

**counsel** 7:4,17 8:22 9:6 14:11,14
15:14 27:22 28:14,19 29:14 32:13
33:9 44:16 45:16,20 46:11,12,16,25
47:9,10,14 51:9 77:10,11 88:21 96:25

**counter-production** 26:11

**County** 40:3 85:17

**couple** 30:22 35:4 96:7 97:5

**court** 4:23,24 5:1 17:13,14 18:4 22:13
32:6,7

**Cozen** 78:20 79:4,5,9 80:3,10,14,22,
24 84:24,25 85:2,4

**created** 48:13 61:22 66:13 68:25

**EXHIBIT 4**

**Creative** 73:4

**credit** 59:18 83:9

**creditor** 34:12,14 37:16

**creditors** 4:5 5:9,11,14 6:20,22 7:1,5, 7 8:21 9:7 17:4 21:14,15 22:9,10 28:21 31:24 34:7 38:10 39:17 51:17 80:6 83:25 97:1 98:13,15,17

**criminal** 16:6,9 17:13 19:1 20:22,24

**cross** 21:22 37:22

**current** 35:8

**D**

**Danger** 51:10

**date** 6:18,19 14:17 20:20 30:17 81:3

**daughter** 68:21

**day** 49:19 81:4

**days** 79:10

**days'** 98:19

**deal** 18:2

**dealing** 41:25

**dealings** 25:14

**dealt** 86:16

**debt** 53:11

**debtor** 17:16 22:14 34:22,23 45:14

**debtors** 5:3,15,20,21,24,25 7:11 17:22,25 23:4 24:23 25:1,5,9,17,24 28:24 32:2,18 44:1,4,18 74:19,24 88:4

**debts** 6:1

**decision** 48:8 98:16

**declined** 94:14

**deed** 52:1

**default** 46:23 50:8 94:3

**defraud** 30:19,21 32:22 52:24,25 53:4 54:1 58:10 62:5,15,16 83:13

**defrauded** 62:10,21 84:18,19

**defrauding** 83:25

**delinquent** 50:7

**delve** 22:12

**departed** 81:12

**department** 5:7 9:11

**desire** 16:19 92:25

**detail** 46:7 84:12

**details** 45:19

**determination** 13:9

**didn't** 16:15 24:20 27:15 53:4,17 56:13 62:11 70:5 78:4,6 79:7,12,15

**differ** 10:21

**different** 21:16 27:19 40:13

**difficult** 16:13

**dig** 42:17

**digitally** 6:2

**direct** 9:8

**directed** 36:12

**direction** 14:5,6

**directly** 78:19

**disclosed** 18:3 48:25 56:22 74:18 83:7

**disconnected** 81:24

**discovered** 84:20

**discovery** 84:20

**discussed** 96:20

**discussion** 11:5

**disrepair** 50:6

**distributing** 96:21

**distribution** 93:24

**distributions** 74:2 96:12

**District** 4:22 5:6 32:7,8

**dividends** 58:5

**document** 15:5

**documentation** 44:23

**documents** 15:9 46:5 47:15,23,25 48:1,11,12,16,18 64:4 72:2,7 75:19 78:18 95:11

**dollars** 21:2 57:13 59:6 89:13 93:8 94:8

**domicile** 35:8 36:18

**don't** 31:6 39:4 42:15 43:9 59:20 60:2,4 63:13,23 64:1,7,9 76:12 77:14

78:25 79:12 80:12,15,18 85:1

**donation** 59:19,24

**donations** 58:25

**done** 8:23 19:4 25:17,21,24 26:2

**Doug** 19:18

**Douglas** 5:1

**drafted** 75:19

**drawn** 41:19

**due** 21:23 44:8 94:16

**duly** 78:7

**duties** 18:16

**duty** 17:19 18:6,8,21,22

**E**

**e-mail** 43:11,19,23 51:8 82:1 83:13

**Eagle** 66:20,23

**Earl** 3:5 7:16 8:4 9:3 29:9 31:18 35:6 37:12 38:11,13 39:1,21 40:10 51:22 78:14 80:4,19 82:11 88:11,22 96:5 97:6

**earlier** 34:4 58:6 84:10 87:19

**early** 46:22 57:10

**earmarked** 49:1,13

**earn** 82:22

**earthquake-resistant** 42:13

**eco-friendly** 62:14

**Ed** 29:18 55:12 94:24

**effect** 62:16

**effort** 84:15

**efforts** 43:3,5 58:9 94:22

**eight** 50:18,19

**Elkhart** 25:18

**EM** 71:13

**employee** 13:3 68:23 81:9

**employees** 57:16 74:1 81:25 82:5

**employment** 81:5,12

**end** 40:15 44:10

**enforcement** 19:9

**entered** 89:1,11 92:13,15

**entering** 89:6 92:18

**enterprise** 83:23

**entities** 11:21,24 14:3,25 17:10 22:25 23:4 25:13,20 26:2 30:20,21 32:21,23 33:4 35:3 36:13 40:13 45:1,15 58:1, 14,18 59:1,7,25 61:24 62:6 66:12,15 67:4,7,11,13 69:2,9 71:18,19 72:5,16 73:22 74:8 80:17 81:4,5,10,13,16 83:6,23 85:22 86:15 89:4,23 92:20 93:21

**entitled** 20:11 94:19

**entity** 17:18 25:2 31:6 38:2 41:15 42:4 44:19,25 63:23 71:10,12,15 73:18,23 87:12 94:1

**entrusted** 33:3

**EP** 71:10

**Equity** 23:20 48:14,15,19 52:11,13 54:6

**escrow** 41:10

**estate** 40:1 48:9 61:7 62:12 75:18

**everyone** 18:15

**everything** 37:25 39:10 41:19

**evidence** 10:15 16:7 30:10 49:11

**evident** 16:10

**examination** 5:14 9:3 29:9 35:6 36:24 37:12 38:11 39:1,21 40:10 51:22 78:14 80:4,19 82:11 88:11,22 96:5 97:6

**excuse** 29:18 71:6 93:5

**execute** 41:6,7,11,21 53:15 75:10 84:17

**exercise** 30:7,15

**expense** 6:10 47:13

**expenses** 49:13

**explain** 53:2 62:9 66:17

**explained** 53:24

**explanation** 46:5

**extensively** 10:7

**extent** 10:4 15:23

## F

**fact** 28:15 30:10,19 44:12 54:3,5 56:10 76:4 80:13 89:21 91:19 98:16

**fail** 77:12

**failed** 46:4 55:2 70:16

**fair** 59:14 81:6 89:14

**Fairfax** 23:2 65:13

**fairly** 44:7

**Fairway** 68:1

**fall** 35:15

**family** 86:22

**Fargo** 83:9

**fax** 83:13

**February** 5:10

**fee** 94:8,11,19

**fees** 54:19 80:10 90:4,7,10

**fell** 53:7

**FEMALE** 8:13

**Fifth** 9:17,21,23 10:12,19 11:4,16,19, 22,25 12:3,7,10,13,15,18,24 13:2,5,8, 11 14:2,4,7,8,22 15:1,23 18:13,24 20:15 21:8 23:1,6,11,15,19,23 24:1,5, 9,13,16 25:4,8,12,16,19,23 26:1,4,7 28:1,4,6 29:15,22 30:7,15 31:4,9 32:24 36:4,15,19 37:5 38:3,17,21 39:8,14,25 40:7 41:1,3 42:19 52:5,10, 17,21 54:10,15,17,21,25 55:4,8,11,14, 17,19,21,24 56:3,8,12,16,20,23 57:2, 5,9,14,18,23 58:7,11,15,19,24 59:4,8, 12,15 61:2,8,11,14,17,19,21,25 62:3 63:4 64:12,15,18,21,24 65:2,5,8,11, 14,17,20,23 66:1,3,5,7,9,11,16,19,21, 24 67:1,3,6,9,12,15,17,21,24 68:2,5,8, 11,18,20,22,24 69:3,6,10,14 70:8,11, 14,18,20,23 71:1,4,8,11,14,17,20,23 72:1,6,9,12,15,18,22,25 73:3,6,9,12, 16,20,25 74:3,6,9,13 75:2 76:25 79:20 80:23 81:2,8,11,17,21 82:3,9,15,18, 21,23,25 83:2,5,10,20,24 84:3,6,9 85:3,6,9,12,15,18 86:2,5,9,13,17,20, 23 87:1,4,7,10,13,16,24 88:16 89:5, 10,17,20 90:1,6,9,12,16,19,23 91:2,6, 9,12,18,23 92:3,7,12,17,22 93:2,10, 14,17,22 94:2,6,10,13,17,21 95:1,4, 10,14,19,21 96:1,13,18,23 97:12,15,

18,21,24 98:2,5,9

**fight** 48:9

**filed** 4:21 5:25 20:9 22:13 32:3 39:18 44:1,9 46:1 47:19 48:5 54:14 55:6 58:23 62:19 68:15 82:17 86:1 97:14, 20,23 98:1,4,8

**filing** 27:16

**filings** 18:3

**fill** 50:17

**finally** 48:11,23

**finances** 28:23 38:19 74:23

**financial** 5:16 17:24 32:1 47:11 89:8, 22

**financials** 89:15 92:20,24 95:5,8

**find** 49:11

**Finders** 87:6

**finding** 21:9

**fine** 10:23 20:7 37:21

**finished** 88:6

**Firestar** 67:23

**firm** 80:22

**firms** 84:22

**first** 14:15 15:24 29:13 35:8 53:19,21 80:6 93:11

**Fisher** 3:8 34:25 35:7 36:11,25 37:6

**fit** 78:11

**five-minute** 33:18,19

**Florida** 66:25 67:2,5

**flow** 76:1

**folders** 61:4

**following** 96:7

**Foraker** 62:5,11,21 70:19 75:15 84:18 90:21 92:5 98:7

**forced** 21:10

**foreclosure** 51:2

**forever** 30:14

**Fork** 60:24

**forms** 81:24 82:2

**forth** 22:3

**EXHIBIT 4**

**forthcoming** 44:2

**forward** 16:8,23 22:19 31:15 38:6 48:3 51:2,18

**found** 57:7 81:20,23

**frame** 81:18,22

**fraudulent** 59:17 60:20

**free** 50:13

**freeze** 96:21

**Fritz** 25:18

**front** 21:8 75:24

**froze** 49:10

**full** 8:2 53:3

**fully** 29:13,21

**fund** 4:20 46:9 48:9 66:6,8,10 87:3

**Funding** 73:4

**funds** 13:1,4,6 14:1 33:1,3 36:12 50:4 57:21,24 58:13 62:20 67:25 69:4,7,23 70:2 80:8,24 83:19 91:24 93:15,16,18, 23 96:14

**furtherance** 83:22

**G**

**Gallagher** 87:21

**gave** 25:25 57:15 76:5

**GBS** 68:1

**GD** 67:19

**Geiger** 92:24 95:8

**gentleman** 43:12

**gentlemen** 63:18

**George** 88:20

**Gingerich** 60:17 69:8 71:5,25 75:14 84:21 88:21 89:2,7,12,24 92:15 93:4, 7,12,19,23 94:4,24 96:9,15

**Gingerich's** 70:12 72:4 93:1 95:6

**give** 7:22 20:8 30:6 43:23 53:3,13 75:18,19,22 77:5 79:7 91:8

**giving** 59:18 77:13

**glad** 62:22

**Global** 12:22 14:3 74:11,25 75:6,7,9, 13,23 76:7 77:11 78:3,18 80:3,7,13,16

81:14,19 82:5 83:4 84:10 85:5 94:23 95:2 97:9,10,13

**goal** 53:12,14

**Golden** 23:7 68:4

**good** 4:2 9:5 18:2

**Goshen** 61:1 85:17

**governance** 48:16

**Grand** 84:2,4

**grant** 16:24

**great** 41:9

**Green** 62:2,7 90:14,20,24 91:3,7,10, 13,16,19,25 92:5,10 95:17,22

**grounds** 84:14

**group** 4:7,10,12,14,17,18 5:24 11:8 23:20 39:19,24 40:4 47:21 48:14,15, 19 52:11,14 54:6 61:7 65:1,10,19 67:23 73:15

**guys** 76:7

**H**

**hadn't** 38:2

**half** 89:12 93:8 94:8

**hand** 7:20 15:2 34:8

**hands** 41:23

**happened** 21:3 78:24 79:1,3,5

**happily** 16:23

**Harvester** 60:25

**hasn't** 31:8

**haven't** 15:19 30:1 62:10

**hazardous** 46:19

**health** 46:20 48:5

**hear** 62:22

**heard** 49:7 51:24

**hearing** 17:14

**Heavens** 68:10

**Height** 3:11 38:24 39:2

**held** 4:5 5:11 11:5 56:19

**Helmuth** 68:13,19,21,23,25 72:17 87:12,14

**Helmuth's** 68:21

**helped** 75:9,13 84:11

**hide** 58:9

**hire** 80:24

**hired** 47:18

**hold** 8:16 98:17,24

**holding** 49:15

**Holdings** 4:8,13,16 23:8 61:10,13,23 65:4,10,13,16,19 66:4,18 71:13 72:24

**Hollow** 22:23 23:12 64:17

**home** 35:16,23,24,25 36:1,3 42:13,14 82:1

**Homes** 62:2,7 90:15,21,24 91:4,7,10, 13,16,19,25 92:5,11 95:17,22

**honest** 29:3 59:21

**Horn** 3:20 88:20,23 89:21 96:2

**hour** 9:2

**houses** 53:12 76:1

**Houston** 24:11

**hundred** 59:5

**hurricane-resistant** 42:11

**I**

**I.D.** 8:11

**idea** 60:15

**identified** 86:25

**identify** 6:13 7:14 29:17 34:17,20

**identity** 12:2 23:9,17

**II** 4:17 39:19,24 40:4 66:10

**III** 4:14

**imaginary** 20:21

**immediately** 45:24 48:1

**immunity** 16:24

**Impact** 74:11,25 75:6,7 80:7 83:4 85:5 97:9,11,14

**imposed** 16:12

**impossible** 16:13

**improvement** 51:1

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,   on 11/15/2016

Index: inaudible..Justice

**inaudible** 8:19 27:21 40:17 89:8

**included** 35:3 36:13 71:24 93:24

**including** 47:12

**income** 36:17 47:12 81:7

**increased** 50:7

**incredible** 16:14

**independent** 50:10

**Indiana** 4:15,22 5:6 9:11,16 11:1 25:11 32:8 45:9 52:3 57:8,12,20 59:10 61:1 68:14 85:17 91:1

**indicated** 11:1 12:21

**indicating** 79:18

**indiscernible** 21:22 37:22

**individual** 5:22 7:7 9:23 28:20 31:18 34:7,11,14 46:16 51:17

**individually** 28:5 44:17

**individuals** 49:8

**inefficiencies** 28:16

**inefficiency** 27:20

**inefficient** 21:18

**inference** 30:8

**inferences** 31:11

**inflated** 91:21

**Infolink** 73:24

**information** 8:6 10:6 17:20,22 18:1 22:12 32:2 44:3,22 45:18 46:9 47:11 51:12 74:18 76:14,16 86:6,10

**initial** 5:9 6:23 34:10

**initiated** 27:18

**inquiries** 83:16

**inquiry** 5:19

**instance** 77:7,8

**instruct** 15:15

**instructed** 33:13 45:16 82:4 96:9

**instructing** 18:14,15

**instructions** 57:16

**instrument** 48:12

**instrumentalities** 83:12

**instrumentality** 83:21

**insurance** 72:10

**intangible** 85:21

**intend** 10:1 30:20 53:4

**intended** 30:19 52:23

**intent** 62:15 69:18

**intention** 14:8,16 15:14,19 32:22,25 33:2 54:1

**intentionally** 53:1 62:10

**intercompany** 58:9 85:25

**interest** 6:21 7:1 14:20 25:3 44:12 48:22 52:14 58:13,21,22 63:17,19,25 71:15,21 72:4,23 73:1,18,21,22,23 81:1,15 89:3,13 90:20 91:3 93:1,20 95:6

**interested** 42:8,10

**interests** 81:15

**interject** 30:22

**intermixing** 37:1

**Interra** 83:8

**interrupt** 9:21 17:2 74:15

**interruption** 8:14

**intervening** 54:8

**interviews** 44:15

**introduced** 85:2

**inventory** 62:13

**invest** 57:3,6 72:16,19,20

**invested** 22:25 38:20 39:3 40:12 56:25 88:14 90:3,13

**investigated** 20:23

**investigating** 20:24 44:14

**investigation** 45:7

**Investing** 66:2

**investment** 4:7,9,12,14,17,18 38:15 39:19,24 40:4 56:14,19 58:5 63:5 64:25 65:3,9,15,21,24 66:14 69:1,4 70:15 73:1 84:1,4 85:13

**investments** 38:18 48:25 56:6,18 58:2 62:6 65:22 87:12,15

**investor** 21:2 36:12 38:9 45:12 47:7 48:24 53:10 59:6 62:1 63:1 64:13,16,

19,22 65:6,12,18 66:22 67:22,25 68:3, 6,9 69:23 71:5,19 72:11,13,20 73:7, 10,13,14 74:2,11 75:6 80:24 85:10,16 87:2,5,8,14 90:17 96:17

**investors** 12:9,11,14,16,25 13:6,9 14:1 16:16,20 20:17 22:23,24 23:2,3, 7,9,12,13,16,17,20,21,24,25 24:2,3,6, 7,10,11 30:19,21 32:22 33:4 41:22 47:11 52:20,23 53:1,4,23 54:1,5 56:5, 9,25 57:25 58:6,10 62:6,10 67:19 74:5 75:17,22 83:14,16,17,18 86:4,8 94:15

**investors'** 64:10 70:16 85:8

**invocation** 28:1

**involved** 23:10 25:13,20 49:8 70:21 92:8

**involvement** 70:24

**involves** 39:4

**ironic** 26:25

**issue** 43:17 51:7

**issues** 19:2 30:10

**IV** 4:18

---

**J**

**Jaffe** 5:4

**James** 39:17

**Jason** 85:11

**JC** 87:3

**Joe** 39:18

**Jonas** 3:6 7:5 8:22 9:2,4,5 10:9,24,25 11:14 13:25 14:13,17 15:5,8,14 18:1, 18 22:19,20,21,22 24:22 25:1 26:18, 21,25 27:14,24,25 28:7 97:3

**Joseph** 40:3

**judge** 19:21

**judicial** 5:17

**Julius** 62:5

**July** 12:19 14:1 37:25 45:5 49:6 81:13 82:5 89:1

**June** 37:14,23 46:1 54:23 55:1

**Justice** 5:7

**EXHIBIT 4**

## K

**K-u-a-t-t** 47:4

**Karen** 38:8

**Kim** 24:14 25:14 46:11,13 54:12,16,18 55:1,5,20

**kind** 21:18

**Knife** 84:8

**knowingly** 38:14

**knowledge** 31:8 78:1 86:12 87:11

**Kos** 3:7,14,18,19 29:7,10,18 30:1,5,24 32:12,19,20 33:7,10,21 51:20,23 60:20 74:16,22 75:4,5 82:12 87:19 88:6,9,12,17

**Kos's** 26:18

**Kuatt** 47:3 50:12 55:15 63:15

## L

**lack** 16:14 31:10

**Lafavre** 81:14 82:4,14,16,19,22 97:17,20

**land** 59:9

**large** 21:1 44:7 62:11

**last** 49:24 66:12 79:8,16 82:13

**later** 6:18 7:4 9:2 30:16 58:5

**laundering** 91:19

**law** 84:22

**lawsuit** 46:24 47:1 55:6 62:20

**lawsuits** 46:21 48:4 75:16 84:11,12, 13,14,16,17

**lawyer** 25:6,10,14,18,21 26:5,6 47:18 56:1 80:21,25 84:22,25

**lawyers** 25:24

**layers** 53:5

**leading** 27:4 31:2

**learned** 44:16 45:4 46:18,22 49:4,14

**left** 81:4

**Legacy** 61:18 73:2

**legal** 44:13 45:16 46:11 80:10 92:10

**lender** 50:15

**lent** 32:22 33:1

**levels** 54:8

**liabilities** 17:21

**liability** 5:22 16:4,6,12 40:20,22 52:3, 4

**life** 72:10

**limited** 5:22 40:20,22 52:3,4

**list** 25:25 44:5,7 47:10 48:24

**listed** 36:18 85:22

**listen** 6:5 53:25

**living** 36:17 48:16

**LLC** 4:7,8,10,11,12,13,14,16,17,18,20 23:8 24:3,15 39:20,24 40:4 44:5 45:9, 21,23 47:16 48:17,20 52:2,9 61:7,13, 16,20 63:3,7,10 65:1,4,7,10,13,16,19, 22,25 66:4,6,8,10,20,23,25 67:23 68:10 71:13,16 72:24 73:2,5,8,11,15, 19,24 74:12 84:2,5 87:6,12,15

**LLCS** 45:12

**loaned** 40:2 58:1

**loans** 85:25

**located** 36:21 90:25

**lock** 30:13

**locked** 37:25

**longer** 58:17 82:7

**looked** 15:3,5

**lost** 38:20 41:12

**lot** 27:5 61:3

**Louder** 13:18

**loudly** 6:14 13:20

**lunch** 8:25

## M

**made** 6:10 10:14 13:9,25 14:3,5 39:8 48:2,7 56:4,24 58:8,25 59:16 60:20 83:4 91:5 92:4 93:3 94:22 96:10

**Madison** 24:7

**Main** 90:25 92:9 95:16

**make** 6:7 12:8 15:12 18:25 21:9 26:8

29:11 47:5,21 49:17,20 50:13,16 74:2 76:19 83:16 89:23 98:25

**making** 30:2,15 31:1

**MALE** 37:19

**manage** 51:4

**management** 23:8 24:15,22 45:21 52:15 54:9,19 63:6,10,12,19 65:7 68:1,4

**manager** 17:10 65:25

**Managers** 73:11

**manages** 63:15

**managing** 46:14 50:11

**Marlin** 25:3 48:13 53:8 58:13,16 72:21

**Matt** 34:25 60:8,9,11,16 69:8 71:24 88:21

**matter** 44:14 46:2 62:24

**matters** 30:11

**maximum** 15:23 88:14

**means** 31:12

**meet** 9:14

**meeting** 4:4 5:9,11,13 6:2,6,8,10,11, 16,20,22 7:2 9:1,10 11:1,14,18,20,24 12:1,4,8 17:4 22:8 27:4 28:21 34:1,11 49:24 80:6 98:13,15,17,20

**meetings** 7:10 10:7 20:13 21:14 51:12 88:3 95:7

**member** 37:19 86:22

**memorandum** 40:19

**memory** 71:2 95:12

**mentioned** 53:19,21 71:18

**met** 39:4

**Michael** 81:9

**Michigan** 25:7

**microphone** 8:16

**Middlebury** 40:18 68:14 91:1 95:16 96:19

**Mike** 41:25 42:6

**Miller** 3:5 7:14,16,19 8:4,5,14 9:3,5 10:25 11:14,17 17:8 18:2,12 22:22 27:11,25 28:12,19 29:9,11 31:18

5 Star Investment Group
341 Meeting,   on 11/15/2016

32:15,20,25 33:2 34:3 35:6,8 37:12
38:11 39:1,17,18,21,23 40:10 44:16,
25 45:1,7 46:1 48:13 49:25 51:18,22,
24 52:11,18,22 54:12,22 56:4,13,17,
21,24 57:3,6,10,15,19,24 58:4,8,12,
16,20,25 59:5,9,13,16,22 60:20,24
61:6,9,12,15,22 62:1,4 63:1,5 64:10,
13,16,19,22,25 65:3,6,9,12,15,18,21,
24 66:2,4,6,8,10,12,17,20,22,25
67:18,22,25 68:3,6,9,12 69:4,7,11
70:9,15 71:6,9,10,12,15,21 72:2,13,23
74:1,4,7,10,17 78:14 80:4,6,19 82:11,
13 83:11 84:1,10 85:7,19 86:3,14,21
87:2,5,8,11 88:5,11,13,22,24 90:2,22
94:25 95:11 96:5,7 97:6

**Miller's**  18:16

**million**  21:2 45:5,11 48:25 49:4 50:1
52:18 54:4 57:12 89:13 93:8,13 94:8

**Ministries**  59:1,3,7 69:5 97:23

**minute**  77:16

**Mishawaka**  12:5

**misinformation**  43:22

**misrepresentations**  56:5,25

**misuse**  32:25 33:2

**MLN**  71:16

**model**  42:14

**moment**  15:20 29:16 42:24

**money**  12:9,11,14,16 13:10 16:20
21:2 32:23 38:1,15,20 39:10,13 40:2,
14 41:6,9 42:18 45:13,14 47:8 49:20
50:25 52:13,23 53:10 56:14,18 57:4,6
58:1,5,21 59:6 60:21 62:12 63:1,6,9
64:10,13,16,19,22,25 65:6,9,12,18,21,
24 66:14,22 67:18,22 68:3,6,9 69:13,
16,17,20,21,22 70:1,15,16,25 71:5,19
72:11,13,19,20 73:1,4,7,10,13,14
74:11 80:7,14 83:4 84:4 85:8,10,13,16
87:2,5,8,14 88:14 90:14 91:20 93:19
94:22 96:17 97:10,13,16,19,22,25
98:3,6

**moneys**  50:16 75:6

**monthly**  76:1 92:19 95:7

**mood**  20:6

**morning**  4:2 9:5

**mortgage**  38:15 45:10 46:23

**mortgages**  40:1,5

**mountain**  21:24 61:9,22 66:18

**move**  12:19 28:9 31:15

**Multifamily**  61:12

**multiple**  53:5

**N**

**name**  5:4 8:2 9:5 26:18 34:19,20,25
37:9 38:6 39:16 43:12 70:22 72:10
87:20

**name's**  38:24

**named**  25:6,10,14,18,21 46:17 63:18

**names**  11:17

**Nappanee**  25:11

**NASA**  70:17 87:21

**National**  61:6

**nature**  41:1,4

**necessarily**  31:19

**needed**  9:1

**net**  59:25

**Nevada**  71:22

**nice**  8:15

**none**  51:19 63:11

**nonfiling**  44:18

**Norman**  25:22 45:21,23

**North**  40:19,21 44:20 45:22 47:18
52:9 54:7 55:10,13,16,23 56:2,6,10,14
67:11 69:5

**northern**  4:22 5:6 32:6,8 57:7,20

**Northwestern**  35:16,19

**note**  26:8,18 37:24 40:17

**noted**  18:4 78:8

**notes**  26:9 41:17 53:10,11 69:1 75:21

**notice**  6:19 98:18,19

**November**  4:3 98:21

**number**  4:7,9,10,11,12,13,15,16,17,
19,20 6:25 31:10 35:2 43:13

**numerous**  46:19

**O**

**O'connor**  78:20 80:10,14 84:24,25
85:2,4

**oath**  5:15 7:13 34:4 88:6

**objection**  77:21,23 78:7

**objections**  15:13

**obligation**  93:7

**obligations**  50:9 54:23

**obtain**  45:17 46:9

**obtained**  40:1,4

**obvious**  19:14

**occur**  64:6 78:22

**occurred**  68:15 96:20

**October**  43:11

**offer**  47:6,21 48:2 50:13

**office**  5:7 6:4,5 8:7

**officer**  32:20 39:23

**offices**  12:5

**official**  9:6

**officials**  9:10,15 11:2

**Ohio**  70:17

**once**  8:1 16:23

**one**  6:23 7:9 9:25 19:19 24:23 26:24
27:7 28:10 31:10 40:23,24 44:17 45:1
49:19 60:12 75:23 76:7,8,19 88:7,9
98:15

**operate**  12:6

**operating**  41:18 49:13,22 50:4

**operation**  52:15 54:20

**operations**  5:21,24 28:23 32:17
81:19

**opportunity**  6:12 7:9 15:20 33:16
43:14

**option**  15:20

**oral**  5:19

**order**  4:23 5:1 9:21 49:16

**ordered**  45:3

**Oregon**  40:15 57:1,4 88:15

5 Star Investment Group
341 Meeting,   on 11/15/2016

**originally** 44:1

**outright** 44:24

**oversight** 17:12

**owed** 50:23 93:13

**owned** 40:24 44:24,25 95:15,20 96:22

**owner** 17:9 24:19,21 45:9 52:4,8 58:17 61:6,9,12,15,18,23

**owners** 24:14 45:18 53:9 77:12

**ownership** 41:8,16 44:6,12 46:6 47:15 52:1 53:5,6,13,24 54:5,7 56:10 58:13 63:17 71:21,24 72:4,23 73:18, 21,23 75:20,23 87:22 90:20 91:3 93:20

**owns** 45:12 48:19 52:9 60:25 63:13

———————

**P**

**P-u-s-t** 85:14

**p.m.** 9:1

**P.O.** 35:10

**package** 70:9

**packages** 69:1

**paid** 50:2 52:12 54:18,23 58:6,21 59:24 69:8 74:5 75:23,24,25 80:8,13, 17 90:4 91:13,15 93:11,18,20,23 94:23 95:3,22

**painfully** 19:14

**paper** 15:2 19:20

**paperwork** 60:13 64:2

**Park** 22:23 35:11,20 64:14

**Parkfairfax** 64:23

**part** 19:8 70:25 84:7 93:3,15,18,23

**parties** 6:21 7:1

**partner** 54:16

**partners** 26:22 70:19 92:4

**passed** 58:20

**patenting** 84:7

**pay** 31:14 38:19 47:7 49:13 57:25 58:5 72:13 80:9 89:12 93:7 94:15

**payday** 75:8

**paying** 50:22 91:21

**payments** 89:23 93:3 96:10

**penalties** 18:6 34:5

**penalty** 7:21

**pending** 23:14 24:4 32:4 77:18

**people** 16:10 38:19 51:11

**percent** 14:20 48:19,21 52:8,14 89:3, 13

**perform** 50:5

**period** 9:9 12:19 89:24

**perjury** 7:21 18:6 34:6

**permission** 90:17

**permitted** 32:13

**person** 38:5 46:14 56:1 60:22 68:25 70:22 86:24

**personal** 12:17 16:4 36:20,21 37:2 38:18,19 57:3 77:25 80:25 81:15 85:20 93:6,16

**personally** 31:5 42:8,15 53:7 63:18 80:21 90:8 94:11 97:10,13,16,19,22, 25 98:3,6

**persons** 11:18,23 12:1 86:16

**pertains** 32:17

**petition** 17:23

**phone** 39:5 76:7,8,24 77:3,15 78:17 79:19 82:1 83:18

**photograph** 19:24

**photographs** 69:11

**picture** 8:11 19:20 26:13

**piece** 15:2 20:25

**pieces** 19:19

**place** 11:15 23:3 35:17,19 42:13 50:10 64:11 96:21

**placement** 40:18

**plainly** 6:14

**plead** 11:4,16,19,22,25 12:3,7,10,13, 15,18,24 13:2,5,8,11 14:2,4,7,8,22 15:1 23:1,6,11,15,19,23 24:1,5,9,13, 16 25:4,8,12,16,19,23 26:1,4,7 28:4,6 32:24 36:15,19 37:5 38:3,17,21 39:14, 25 40:7 42:19 52:5,10,17,21 54:10,15, 17,21,25 55:4,8,11,14,17,19,21,24 56:3,8,12,16,20,23 57:2,5,9,14,18,23

**payments** (continued) 58:7,11,15,19,24 59:4,8,12,15 61:2,8, 11,14,17,19,21,25 62:3 63:4 64:12,15, 18,21,24 65:2,5,8,11,14,17,20,23 66:1,3,5,7,9,11,16,19,21,24 67:1,3,6, 9,12,15,17,21,24 68:2,5,8,11,18,20, 22,24 69:3,6,10,14 70:8,11,14,18,20, 23 71:1,4,8,11,14,17,20,23 72:1,6,9, 12,15,18,22,25 73:3,6,9,12,16,20,25 74:3,6,9,13 79:20 80:23 81:2,8,11,17, 21 82:3,9,15,18,21,23,25 83:2,5,10, 20,24 84:3,6,9 85:3,6,9,12,15,18 86:2, 5,9,13,17,20,23 87:1,4,7,10,13,16,24 88:16 89:5,10,17,20 90:1,6,9,12,16, 19,23 91:2,6,9,12,18,23 92:3,7,12,17, 22 93:2,10,14,17,22 94:2,6,10,13,17, 21 95:1,4,10,14,19,21 96:1,13,18,23 97:12,15,18,21,24 98:2,5,9

**pleading** 36:4 39:7 41:1,3

**pleadings** 84:13

**point** 10:13 12:21 24:17 38:13 90:13, 24 91:25 92:25

**portfolio** 57:17

**Portland** 4:8 39:3 42:1 57:1,4 84:19 88:15

**position** 20:6 89:8

**possession** 69:15 72:3

**possibility** 43:16

**possibly** 42:6

**Postal** 83:22

**potential** 98:15

**potentially** 19:11

**power** 19:9,10 39:10

**Praet** 25:22 45:22,23,24 46:15 48:11 55:18

**preceding** 33:14

**Premier** 65:22,25 73:11,14

**prepare** 60:13 84:11 86:3

**prepared** 43:15,16 84:22

**prepetition** 32:18

**prepetitioned** 17:10

**present** 11:18,20,23 40:14

**presented** 15:19

**presently** 69:15

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,  on 11/15/2016

Index: preserve..recorded

**preserve** 15:22

**presumes** 24:21

**pretty** 16:10

**previous** 68:17 76:16

**previously** 8:7 15:17 34:10 36:18
73:19 75:1 91:15

**price** 59:18,25 91:21

**primarily** 13:4

**principal** 17:17 72:17

**prior** 6:22 7:10 10:7 85:4 89:6 91:16
92:18,25 95:6,23

**private** 40:18

**privilege** 10:1,9,19 20:4

**probably** 16:10 20:2

**problem** 31:13

**problems** 27:21

**proceed** 10:22 22:19 27:14 33:21
34:24 37:4

**proceeding** 5:17,18 17:13 18:25 19:1
31:17 36:14

**proceedings** 27:20

**process** 21:18,19

**produced** 16:7

**product** 15:4 76:3

**production** 15:8

**products** 62:14 84:2,5

**promissory** 37:24 40:17 53:11

**pronouncing** 47:4

**proofs** 39:18 44:9

**proper** 20:3

**properly** 86:19

**properties** 40:2,5,6 57:1,4,7,12,17,
20,22 63:16 67:11,13 71:16 88:15
96:22

**property** 6:1 38:16 41:8,9 42:4,6,8
45:10 50:6 52:2,9,16 53:6,7 54:7
55:10,13,16,23 56:1,7,11,15 59:10,14,
22 60:21,25 65:1 67:2,4,7,10,16
68:14,16 69:16 70:17 73:11 82:19
83:3 85:20,21 90:25 91:7,10,14,15
92:1,9 94:7,12,15,16,18 95:16,23,25

96:20

**prosecution** 62:24

**prospect** 16:5 21:14

**prospectuses** 86:3,7,11

**protect** 47:7

**protection** 20:9 27:17

**protections** 20:3

**provide** 17:20 46:4,5 47:10,15 62:11,
23 84:11

**provided** 8:7 43:22 48:1 86:4

**public** 20:16 83:12

**publicly** 18:4 22:13

**purchase** 45:13,15,19 46:10 47:6
49:5 52:19 59:17,25 62:12,13 63:2
70:16,25 89:2,3,6 91:4 92:14 93:1,5,6
94:4 96:11,15

**purchased** 40:2 44:19 45:4 49:4
90:25 91:7,10 92:1 95:17

**purchasing** 91:17

**purpose** 5:13 22:9 27:19 66:17 79:19

**purposes** 91:20

**pursuant** 4:5 17:5,14

**pursue** 46:8

**pursued** 48:6

**push** 48:3 51:2

**Pust** 85:14

**put** 37:23 38:2,15 56:13,17 96:21

**putting** 42:10,11

**puzzle** 20:25 21:1

## Q

**question** 9:24 10:2,17,22 14:9,10,14
15:16 18:13 24:20 27:7 28:10,18 30:1,
4,18,24 32:14,16,19 33:10,14,16 34:9,
10 40:12 41:5,24 69:19 74:20 77:1,19,
24 78:9,16,17

**question's** 33:11

**questioned** 43:3,6 77:9

**questioning** 7:6 75:3

**questions** 5:20 6:12,23 7:3,9,10

8:23,24 9:18 10:5 16:4 18:19 20:19
21:5,10,19 22:4,20 28:7,22 29:12
30:13 31:3,25 32:14 33:22 34:6,14,24
35:4 37:8 39:6 40:25 41:2 51:6,18,20
74:23,25 80:12 88:7,19,24 96:8,25
97:1,2,5,8 98:11,12

**quote** 59:19

## R

**raise** 7:20 11:7 34:8

**raised** 10:5 49:25 52:19,22 53:10
54:4

**raising** 13:4

**Randy** 75:16

**rate** 50:7

**reach** 76:14

**read** 15:10 19:19 43:14 86:6

**ready** 41:19 75:16

**real** 31:15 40:1 61:6 62:12 75:18
85:20

**Realtor** 70:21 87:19

**reask** 33:13

**reasking** 21:19

**reason** 6:17 9:14 16:8,18

**reassert** 10:12,19

**recall** 9:9 11:17 12:23,25 13:3 14:21
49:24 70:24 74:24

**receipt** 94:12

**receivable** 44:8

**receive** 40:16 49:20 86:15 94:19
97:10,13,16,19,22,25 98:3,6,18

**received** 43:11,19 47:25 48:11,18,24
49:2 56:21 86:18 90:7 94:9

**receiver** 46:25 47:18 48:4,7,10 50:10,
13,15,18,20 51:3

**recognized** 41:17

**record** 7:15 8:3 10:11 11:5 13:23
21:20 26:9 27:8 29:17 30:2 31:21
34:1,20 36:9 37:10 38:7 42:22 43:2
60:16 76:3 88:2 98:21

**recorded** 6:2 93:25

**recording** 6:3,6,8,15 33:24 87:25 98:23

**records** 13:25 52:7

**recover** 16:13,20 62:20 94:22

**reducing** 59:17

**refer** 89:4

**referring** 26:12

**reflect** 48:18

**reflected** 86:1

**reflecting** 44:23 47:15

**refresh** 71:2 95:12

**refurbished** 50:19

**regard** 43:1,3,6,7,24 51:6,25 95:5,15

**regarding** 5:15,21,23 22:13 28:22 43:20 44:2 46:9 87:21 97:8

**regardless** 14:9 15:16

**rehab** 41:10 50:16

**reimbursement** 49:18,21

**reinstate** 10:18

**related** 95:12

**relationship** 85:4 97:9

**releasing** 50:16

**relevant** 31:19

**remember** 64:1 78:25 79:12 80:12,15 87:20

**remind** 34:4

**reminder** 10:4

**Remodeling** 73:8

**rent** 36:3 47:12

**rented** 50:18

**rents** 50:7 55:2

**repair** 46:18 49:16

**repairs** 49:18,20 50:5

**repeat** 32:15,19

**rephrase** 33:1 58:3

**report** 51:5

**reports** 50:15,20

**represent** 27:10,12 31:7 56:9 80:25

**representative** 17:18

**represented** 47:2 80:21

**representing** 34:13 35:1 38:14 81:14

**requested** 46:4 47:9,14

**reserve** 7:2 98:11,14

**reside** 35:9,14

**resolve** 30:10

**Resource** 62:2,7 90:14,20,24 91:4,7, 10,13,16,19,25 92:5,11 95:17,22

**resources** 16:14

**respect** 17:21 18:16 21:23 31:11 51:5

**respond** 15:15 18:6,9,20 45:24 76:23 77:12,14 78:5,6

**responsible** 13:4

**restructure** 75:12

**restructuring** 75:9

**resulting** 59:25

**resume** 9:1 75:4

**retainer** 75:25

**retaining** 27:21

**return** 12:4 14:1 93:25

**returned** 13:1,6,10

**review** 86:6 92:24 95:8,11

**revoke** 10:14

**rights** 15:23 31:9

**Riley** 3:12 39:16,22

**Road** 85:17

**Robert** 62:5

**Roberts** 3:16,22 4:2 5:4 7:17,19 8:1, 5,10,20 9:20 10:20,24 11:6,10 13:12, 16,19,22 14:11 17:1,8 18:11 19:12,17 21:11 22:2,7,18 27:6,13,23 28:11 29:16,20 31:16,22 32:12 33:17,25 34:16,18 36:6,9 37:3,7 38:5,22 40:8 51:14 74:14,17,22 79:21,24 80:2,5 87:17 88:1,10,18 96:3 97:4,7 98:10

**rock** 8:17

**roll** 42:6

**rolls** 47:12

**RSR** 91:11 95:17

**Rudy** 68:13,21 72:17

**S**

**sale** 46:7 68:14 92:4,8 95:6 96:16

**sales** 90:5 94:18 95:24

**Samuel** 37:11

**Sarah** 68:19,21,23,25

**schedules** 5:25 17:23 32:3 44:4,7 74:18 83:8 85:23 86:1

**Schwartz** 25:3 48:14 53:8 58:13,16, 21 72:21 73:7 93:19

**scope** 31:4 36:23 77:25

**Scott** 82:24

**seated** 42:24

**SEC** 19:8 20:20,21 45:6 46:2 49:10 53:16 96:21

**second** 15:25 36:11 43:2 91:24 92:13

**Secretary** 52:6,7

**Section** 4:5 17:4,5,15 31:24

**securities** 9:10,15 11:2

**seeking** 27:17

**sees** 78:11

**self-serving** 20:18

**sell** 42:6 57:17 59:22

**selling** 96:22

**send** 6:6 78:4,13

**sends** 77:11

**September** 5:12 12:20 14:19 39:5 48:10,23

**serious** 77:1

**Servants** 59:10,22 60:5

**serve** 45:17

**served** 45:20

**server** 64:5

**Service** 83:22

**set** 53:5 75:17

**Seven** 68:10

**shared** 26:9

5 Star Investment Group
341 Meeting,   on 11/15/2016

sheet 47:12

sheltered 18:7

Sherman 25:6

shortly 68:15

shots 82:7

show 16:8 42:13 45:11 52:7,12

showed 45:8

shows 76:4

side 75:24

sign 63:25 74:4

signatory 74:7

signed 20:10 63:21

simple 28:10 53:14

simply 28:19

single 18:13

sir 12:23 14:17 20:5 24:23 27:1 30:18 34:12 38:23 52:25 89:18

sit 20:14

situation 16:17 18:7

small 11:8

snowball 21:24

sold 57:21 59:9,13 60:12 87:23 90:3 91:16 92:1 94:7,16

sole 17:9 24:19 81:6

Solely 27:11

Solution 45:21

Solutions 24:15,22 63:7,10,12,20

someday 38:4

sort 69:12

source 36:16 81:6

South 6:4 12:4 40:3,5 60:24 67:14

Southern 23:20 48:14,15,19 52:11,13 54:6

speak 6:14 8:15 13:12 36:7 87:17 89:18

speaking 17:2

specific 19:23 51:6 54:11 77:7,10

specifically 22:9 43:8 53:21

specifics 79:7

spoke 46:16 79:8,17 82:13

spoken 39:5 76:6

spring 9:8 11:2

Springmont 65:4

St 40:2

stability 89:22

Stan 40:9

stand 47:24

star 4:7,8,9,10,12,13,14,15,16,18,19 8:17 11:21,24 12:5,6,8,11,14,16 13:3, 7 14:3,24 22:25 23:4,9,13 24:12,15,22 25:1,13,17 26:2,5 27:12 30:20,21 32:21,23 33:4 34:2 35:2 36:12,24 38:14 39:3,19,23 40:3 44:3,5,11,19 45:1,7,20 48:21 52:20,23 54:4,5 56:5, 19 57:11 58:1,14,17,18 59:1,7,24 61:24 62:6 63:1,5 64:10,13,16,19,22, 25 65:3,6,9,12,15,18,21,24 66:2,4,6,8, 10,14,22 67:4,7,10,13,18,19,20,22,25 68:3,6,9,23 69:1,4,8,9,13,17,20,21,22, 23 70:3,5,10,13,15 71:8 72:4,11,13, 16,19 73:1,4,7,10,13,17,19,21,22 74:2,5,8,11 75:5 80:8,9,17 81:3,5,6,9, 13,15,20,25 83:6,14,23 84:4 85:7,10, 13,16,21,22 86:4,8,14,18 87:2,5,8,14 88:3 89:4,8,23 90:3,11,14 92:20 93:20,24 94:18 95:5 96:22

start 29:12 51:25

started 21:24

state 8:2 9:11,15 10:10 11:2 34:19 36:22 37:9,15 38:6 41:25 42:7 52:6,7 67:16

stated 28:15 42:5 75:12

statement 17:24 27:1 39:9 43:15 46:2 49:3 51:13 52:12 76:19

statements 47:13

States 4:23 5:5,8 6:24 7:3 17:3,12,15 20:12 22:11,16 31:23 32:5,7 83:22

stating 40:17 46:3

stemmed 96:15

step 15:22 51:17

Steve 38:24

stock 96:11,16

straight 42:23

straightforward 54:2

Stream 69:5

Street 92:9 95:16

Streets 59:11,23 60:5

structure 46:6 47:16

stuff 75:11

stumble 43:17

subject 46:20

subjects 15:17

submit 15:11

subpoena 15:7 76:9,10,23 77:2,11 78:4,13

subpoenas 45:17,20,25

subscription 41:18

substantial 49:12

substantively 4:25

successful 49:9

sue 75:15

suggest 51:7 75:1

suggested 44:11

sum 62:11

summer 44:21

Sungate 68:7 94:7,12,15,20

supersede 18:22

supposedly 46:14 62:14

surprise 52:6

Susan 5:4

Sutter 43:12,20 55:22

Swartz 3:9 37:11,13,18,23

swear 7:21 34:3

switch 40:15 41:20 53:13,22

sworn 18:5

system 8:15 22:15

---

**T**

table 19:2

**EXHIBIT 4**

5 Star Investment Group
341 Meeting,   on 11/15/2016

Index: taking..unsecured

**taking** 9:17 19:24 29:14,22

**talk** 20:15 21:22 37:22

**talked** 42:15 66:13 68:16 79:6 83:18

**talking** 21:13 59:20 60:2 77:7 78:5

**target** 46:19

**tax** 93:25

**Taylor** 25:15 46:11 55:20

**TC** 23:24 40:15,19,23 41:13 42:1,2 43:1,7 45:22

**team** 44:13 45:3 46:8 76:16

**technical** 98:25

**telephone** 83:13,17

**telling** 33:8

**ten** 89:24 93:8

**tenant** 50:25

**tenants** 55:3 86:15

**Tennessee** 24:7

**terms** 20:4 22:4 36:22

**testified** 14:19 15:17 80:7

**testimony** 7:22 12:23 14:21 30:6,14 54:3 62:23 95:12

**Texas** 24:11 67:8

**text** 82:1

**thereof** 31:10

**thing** 13:15 53:12

**things** 19:16 43:13

**third** 16:1 43:4

**Thompson** 7:18 10:10,23 15:4,7,11, 18 17:7 18:10,20 19:4,7,13 20:1,7 21:6,13 22:1,6,17 24:17,24 26:3,5,8, 15,19,20,24 27:2,7,11,15 28:17,25 29:2,24 30:22,25 31:1,16,20 32:11 33:5,8,12,23 36:23 37:15,21 77:4,16, 20,23 78:10

**thousand** 59:6

**three** 66:12

**tied** 41:23

**Timber** 22:23 23:12 64:17

**time** 6:4 9:9 10:13,17 13:19 15:25 16:1 21:17 38:13 39:9 40:16 42:7,9,22

43:2,4 45:6 47:20 54:13 75:24 79:8, 13,15,16 81:18,22 82:13 84:15 89:16 90:4,13 91:4 92:8,25 98:14,19

**times** 20:15 21:16 75:12 91:16

**title** 45:3,8,11

**today** 4:3 6:16 7:22 9:18 11:9,11 14:9 15:10 28:1 41:1,3,8 43:18 54:3 86:25 95:13 98:11,20

**today's** 7:2 36:13

**told** 33:15 42:9 78:24 79:4,5

**tongue-tied** 71:6

**topic** 79:23,25

**Torch** 84:8

**tornado-resistant** 42:12

**Toth** 62:5,11,21 75:15 84:17 90:21 92:5 98:4

**Townhome** 49:3

**townhomes** 43:20,24 44:6,8,21 46:15 51:4

**Trace** 22:24 64:20 65:7,16

**transaction** 72:8

**transcript** 6:9 35:18

**transfer** 59:17 60:4,14 64:4,6 72:3 74:10 75:5 83:19 85:7,10,13 96:19

**transferred** 59:7 67:19,23 68:1,4,7, 10 70:25 71:19 73:10,14 86:21,24

**transfers** 12:12 58:9 60:21 75:1 83:3

**transparency** 27:3

**transparent** 26:23

**Transport** 73:14

**Trent** 65:10

**tribunal** 21:9 24:12

**true** 52:18,22,25 56:4,13,17,21,24 57:10,15,19,24 58:4,8,12,16,20,25 59:5,9,13,14,16 61:22 62:1,4,8 63:1,5 69:7 81:12,18,22 82:4 83:11,15 86:11 88:25 96:9,14,19

**trust** 23:21 35:18 44:18 48:12,15,16, 19 52:11,14 53:8 54:6 61:10,18,23 76:23 77:2,6,15 78:17 87:3,9

**trustee** 3:16,22 4:2 5:2,5,8 6:24,25 7:17,19 8:1,5,8,10,20 9:20 10:20,24

11:6,10 13:12,16,19,22 14:11 17:1,3,8 18:11 19:12,17,18 20:12 21:11 22:2,7, 11,18 27:6,13,23 28:8,11 29:16,19,20 31:16,22,23,24 32:12,13 33:13,17,25 34:16,18 36:6,9 37:3,7 38:5,22 40:8 41:12 51:14,15 62:19 74:14,17,22 76:13 77:4 79:21,24 80:2,5 87:17 88:1,10,18 96:3 97:4,7 98:10

**truth** 7:23,24

**turn** 19:22

**turnaround** 12:22

**twice** 16:22

**Twin** 23:16 40:24 41:7,15,16 43:1,20, 24 44:3,6,8,12,21 45:13,15,18,19 46:7,10,14 47:16 48:17,20 49:1,3,14, 17,19,22 50:1,3,4,8,11,21 51:25 52:1, 2,19 53:17,22 54:1,20,22 75:20

**two** 6:3 10:7 19:15 26:10 89:12 91:16 93:8 94:7 95:23

**type** 16:5

**U**

**U.S.** 8:8 46:23 49:15 50:9 54:23 55:6

**Uh-huh** 21:6 28:17

**ultimate** 61:23

**ultimately** 21:8 90:10

**uncertain** 50:24 51:1

**unclear** 49:21

**understand** 10:15 17:7 18:12 22:1,6, 17 26:20 30:5,12 31:4 42:2 78:21

**understanding** 9:14

**understands** 30:3

**underwater** 57:22

**unfortunately** 41:11,21,23

**UNIDENTIFIED** 8:13 11:8,12 34:13 37:19

**uniform** 93:5

**Union** 83:9

**unit** 89:1,6 92:14 93:6 94:4

**United** 4:22 5:5,8 6:24 7:3 17:3,12,15 20:12 22:11,16 31:23 32:5,7 83:21

**unsecured** 9:7 38:9 97:1

**update** 43:23

**Utah** 23:8 65:19

**utilize** 48:8

**utilized** 46:10

---

**V**

**vacancies** 50:18

**vacancy** 50:6

**vendors** 50:9,22,23

**Ventures** 66:20,23

**versus** 31:6

**View** 61:9,23 66:18

**VII** 4:12

**Villa** 67:20

**Village** 24:2 63:2 75:20,21

**violations** 46:20 48:6

**visited** 82:19

**Vista** 82:20

**VOICE** 8:13 11:8,12 34:13 37:19

**voluntarily** 17:11 32:3 92:15

---

**W**

**waive** 30:16

**waived** 10:8 53:2 75:2

**waiver** 10:14,16 30:15

**warrant** 75:7

**water** 57:13

**Wells** 83:9

**west** 42:5

**whatsoever** 46:6

**whichever** 34:22

**William** 7:5 35:1 87:20

**Williams** 70:22

**Win** 87:9

**Winston-salem** 23:17 44:20 48:17, 20 50:21 52:2 54:7

**wire** 12:11 83:19

**withdraw** 58:2

**Withers** 47:3 50:12 55:9 63:15

**Woodland** 35:10,19

**work** 15:4 20:3 45:3,8,11 70:5 76:3 81:3 95:2

**worked** 25:6,9 62:4 70:13

**working** 51:10

**works** 22:5,15 50:20

**worth** 38:16 40:6

**wouldn't** 52:25

**writable** 6:7

**write** 35:17

**writing** 15:12

**written** 15:10

---

**X**

**XYZ** 73:19

---

**Y**

**ya** 59:21

**year** 80:15 93:11

**years** 6:3 89:24 93:9

---

**Z**

**Zercher** 25:10 60:13

**zero** 16:7

**ZIP** 35:13

**zoning** 46:19 48:5

**Zupetzes** 85:8 98:1